TOLEDO, ST. L. & K. C. R. CO. et al. v. CONTINENTAL TRUST CO. et al.

HAMLIN et al. v. SAME.

ROSE v. SAME.

(Circuit Court of Appeals, Sixth Circuit. July 5, 1899.)

Nos. 640, 641, 673.

1. JURISDICTION OF FEDERAL COURTS—FORECLOSURE OF RAILROAD MORTGAGE —POSSESSION OF RECEIVER.

Where a federal court, by its receiver, has possession of all the property of a railroad company for the purpose of administering it as the property of an insolvent corporation in a suit brought by general creditors, such possession draws to that court, as auxiliary, all suits and proceedings with respect to the property, and it has jurisdiction of proceedings to foreclose a mortgage without regard to the citizenship of the parties, whether such proceedings are by cross bill or intervening petition in the pending suit, or by an original bill.[1]

2. SAME—BILL ANCILLARY TO CREDITORS' SUIT—PROCEDURE.

The fact that a federal court acquires jurisdiction of a suit to foreclose a railroad mortgage, by reason of its being ancillary to a pending creditors' suit, in which the court has, through its receiver, taken possession of the mortgaged property, does not make the two suits one, though, for convenience in hearing, they are consolidated, nor does it affect the rules governing parties, issues, or pleading in the foreclosure suit, and, where the mortgage constitutes the first lien on the property, it is not necessary that a decree of foreclosure should await the establishing and adjustment of all claims filed in the creditors' suit.

3. EQUITY—CONSOLIDATION OF SUITS.

Rev. St. § 921, authorizing consolidation of suits, applies as well to suits in equity as at law, and the consolidation of two suits in equity is within the sound discretion of the court, but suits consolidated remain separate as to parties, pleadings, and decrees, unless otherwise directed.

4. ESTOPPEL—CREDITORS OF DE FACTO CORPORATION—DENIAL OF CORPORATE EXISTENCE.

Creditors of a de facto corporation, who dealt with it as a corporation, are estopped to deny its corporate existence for the purpose of defeating a mortgage which it executed in such capacity.

5. RAILROAD COMPANIES—CONSOLIDATION—DE FACTO CORPORATIONS.

Where the statutes of a state authorize the consolidation of railroad companies of the state with those of other states under certain conditions or circumstances, a consolidation of such companies creates a de facto corporation, even though the constituent companies did not possess the qualifications required by the statute to render the consolidated company a corporation de jure, and its corporate existence can only be questioned on that ground by the state.

6. SAME—CONSOLIDATION UNDER ILLINOIS STATUTE.

Under the statute of Illinois (3 Starr & C. Ann. St. p. 3241), providing that "whenever any railroad which is situated partly in this state and partly in one or more other states, and heretofore owned by a corporation formed by consolidation of railroad corporations of this and other states," has been sold under a decree of a court, and "purchased as an entirety," and is held by corporations of the different states in which it is situated, the Illinois corporation owning the portion within that state may consolidate with the others, it is no objection to the legality of such consolidation that the original consolidated company which operated the road before its sale, as to a short section of it, held only the equitable title, the legal

---

[1] As to mortgage foreclosures in federal courts generally, see note to Seattle, L. S. & W. Ry. Co. v. Union Trust Co., 24 C. C. A. 523.

title being in a local company, practically all of whose stock was owned by the consolidated company, nor can it be held that the road was not "purchased as an entirety," within the meaning of the statute, because it was sold in two divisions, being covered by separate mortgages,. where both divisions were sold on the same day to the same purchaser, and were conveyed by one deed.

7. SAME—CONSOLIDATION UNDER OHIO STATUTE.

Under Rev. St. Ohio, § 3380, which permits the consolidation of an Ohio railroad company with a company of "an adjoining state," where the roads of the two companies will form a continuous line, the legality of a consolidation between an Ohio and an Indiana company is not affected by the fact that an Illinois company is also included as a constituent member of the consolidated company, where the roads owned by the three companies form a continuous line.

8. SAME — VALIDITY OF BONDS — PRICE RECEIVED WHEN ISSUED IN PAYMENT FOR PROPERTY.

In ascertaining the price for which bonds of a railroad company were sold, for the purpose of determining their validity under a statute prohibiting their sale for less than 75 per cent. of their par value, but which fixed no minimum limit on the sale of stock, where the bonds were not sold for cash, but an amount of both bonds and stock were issued to a contractor in consideration of his agreement to purchase a railroad at foreclosure sale, to pay off liens thereon, to reconstruct it, changing it from a narrow-gauge to a standard-gauge road, and to equip it with rolling stock (in effect as the purchase price of a reconstructed and newly-equipped road), it is not necessary that the value of the consideration received by the company should be equally distributed between both bonds and stock, according to the amount of each issued to the contractor, but the stock may properly be computed in the payment at its market value; nor is the value of what was actually done by the contractor the measure of the consideration received by the company for the bonds, but the value of what he undertook by his contract to do.

9. SAME—RIGHT OF SUBSEQUENT CREDITORS TO ATTACK VALIDITY OF BONDS.

Where a full settlement has been made between a railroad company and a contractor, to whom the company issued bonds in payment for work, which settlement was acquiesced in by all parties in interest, subsequent creditors of the company cannot attack the validity of the bonds on the ground of fraud on the part of the contractor or a failure to properly perform the contract.

10. SAME—PURCHASE OF BONDS BY DIRECTOR FROM CONTRACTOR—OHIO STATUTE.

Rev. St. Ohio, § 3313, providing that all stock, bonds, or securities of a railroad company purchased by a director thereof, either directly or indirectly, for less than their par value, shall be "null and void," applies only to original sales made by the company, and the acquiring of an interest in bonds by a director through a contractor to whom the company had contracted to deliver them in payment for work, after they had been issued by the company, and deposited with trustees to be delivered to the contractor as the work progressed, either by direct purchase, or by a secret agreement, made after such issuance and deposit, for a share of the profits of the contract, does not invalidate such bonds.

11. SAME—VERBAL OPTION GIVEN BONDHOLDERS OF OLD COMPANY.

Nor are they void under the statute by reason of a verbal option given certain directors by the contractor to purchase bonds from him for less than par, after they were earned under his contract, in consideration of their consent, as bondholders of a prior company, to a certain plan of reorganization, which agreement was wholly collateral to his contract with the company.

12. SAME—WAIVER OF DEFENSE—RIGHTS OF SUBSEQUENT CREDITORS.

Such statute is for the protection of the corporation, and does not make stock or bonds of a company sold to a director for less than par absolutely void, but voidable only, and subsequent creditors cannot attack the valid-

ity of bonds on that ground, where it is not questioned by the corporation or its stockholders.

13. SAME—LIEN OF PREFERRED STOCKHOLDERS—LACHES.

A provision in certificates of preferred stock issued by a railroad company, making such stock a lien on not only the net earnings, but on the property of the company, is not illegal, as against common stockholders, in the absence of a statute or charter provision affecting it; and, where such certificates were issued and placed on the market with the knowledge and acquiescence of the then owner of all the common stock, holders of common stock cannot after 10 years, and on final distribution of the property of the company for the first time, raise the objection that such provision was not authorized by any action of the directors.

14. SAME — DE FACTO DISSOLUTION—FORECLOSURE—SALE OF PROPERTY AND FRANCHISES—DISTRIBUTING SURPLUS.

Where the entire property and franchise of a railroad company are sold in foreclosure proceedings, and conveyed to the purchaser, such act puts an end to the capacity of the company to do the only business for which it was created, and may be treated as a de facto dissolution of the corporation, for the purpose of a final administration of its assets; and such action is especially justified where there are preferred stockholders having a prior right in the distribution of any surplus remaining after payment of the debts of the corporation, but who have no voice in its management, and, in such case, a pending creditors' suit against the company may be utilized by the court for the purpose of requiring all creditors, on due notice by publication, to present their claims, and, on their adjustment and payment, for making distribution of any surplus in accordance with the rights of the stockholders as established in the foreclosure suit.

15. APPEAL—DECREE REFUSING LEAVE TO INTERVENE.

No appeal lies from a decree refusing leave to intervene and become a party.

## Appeals from the Circuit Court of the United States for the Northern District of Ohio.

The appeal in the principal case, styled as above, is an appeal by the railroad company, and various intervening creditors of that company, from a decree foreclosing a first mortgage made by said railroad company to secure an issue of its bonds aggregating $9,000,000, and directing a sale of all of its property and franchises, and dismissing various intervening petitions filed by unsecured creditors of said mortgagor railroad company attacking the validity of its mortgage bonds upon various grounds, and from a decree upon the cross bill of Charles Hamlin and others, giving to holders of preferred stock issued by said railroad company a preference over the common stock in the surplus of the property of said railroad company, after the payment of all of the debts of the company. The appeal of Charles Hamlin and others is from so much of the decree of sale as charged the property of the railroad company with a lien for all debts of the company which might at any time be established to the extent that the holders of such preferred shares might use the same in paying any bid made by them as purchasers at the foreclosure sale of said property. The appeal of Dana A. Rose is from a decree striking an intervening petition filed by him from the files.

The Toledo, St. Louis & Kansas City Railroad Company is a consolidated corporation of Ohio, Indiana, and Illinois. Its road extends from Toledo, in Ohio, to East St. Louis, in Illinois, and is 450 miles in length. This consolidated company was organized June 19, 1886, by a consolidation of three constituent companies, corporations, respectively, of the states of Ohio, Indiana, and Illinois. In May, 1893, Stout and Purdy, citizens of New York, and judgment creditors of the said consolidated company, filed a creditors' bill in the circuit court of the United States for the Western division of the Northern district of Ohio against said railroad company, in behalf of themselves and other creditors. Like bills were filed at the same time in Indiana and Illinois. Under these bills, the same receiver was appointed in each jurisdiction, and the entire line of railway was thereafter operated under the direction of the

circuit court for the Northern district of Ohio, that being the court of original and primary jurisdiction. Other creditors were, by publication under order of the court, invited to come in under that bill, and to file their claims before the master, and many of them did so; among them being a committee representing the holders of first mortgage bonds as a class. At the time of the filing of this creditors' bill, there had been no such default in payments of interest upon the mortgage debt as would authorize foreclosure. Such default did subsequently occur, and thereupon the trustees under the first and only mortgage filed a bill in the same circuit court for the foreclosure of that mortgage. These trustees were the Continental Trust Company, a corporation of the state of New York, and John M. Butler, a citizen of the state of Indiana. The defendants under this foreclosure bill were the railroad company, the receiver appointed under the creditors' bill of Stout and Purdy, and certain judgment creditors of the railroad company. This bill was filed by leave of the court, and the receiver under the creditors' bill was made receiver under the foreclosure bill. At the same time an order was made consolidating the creditors' suit with this foreclosure proceeding, and directing that the consolidated cause should take the title of the foreclosure proceeding, and that the receivership under the creditors' bill should be extended to the said foreclosure suit. Answers were filed to this foreclosure suit by the railroad company, and by the judgment creditors made parties defendant thereto. The answer of the railroad company declined to admit that it was a validly consolidated company, though it had acted as such; declined to admit the validity of the mortgage or of the bonds secured thereunder; denied default in interest as well as insolvency; and declined to admit the averments of the bill as to the bona fide character of the owners of the mortgage bonds. Some of the judgment creditors made defendants denied the legality of the consolidation under which the mortgagor company became a corporation; denied the power of the company to make a mortgage or issue bonds; and denied that the present holders of said bonds were bona fide holders for value; and asserted the priority of their judgments over the bonds. In the foreclosure suit certain creditors of the railroad company were permitted to intervene by petition for the purpose of attacking the validity of the bonds of the railroad company. This they did, by averring that all of the bonds had been sold by the company at less than 75 cents on the dollar, in contravention of section 3290, Rev. St. Ohio, and also that they had been purchased by directors at less than par, and were therefore void, under section 3313, Id. Hamlin and others, representing a majority of the preferred stock of the company, were also admitted as defendants to the foreclosure suit, and allowed to answer and file a cross bill. The history of the admission of these preferred stockholders as defendants, over the objection of the complainants in the foreclosure suit, is fully stated in the opinion of this court, reported as Hamlin v. Trust Co., 47 U. S. App. 422, 24 C. C. A. 271, and 78 Fed. 664. The answer of the Hamlins, as representatives of the class of preferred stockholders, denied the validity of the bonds, upon the ground that they had been fraudulently paid out to one S. H. Kneeland, the holder of the entire common stock of the company, upon a contract with him under which he was obligated to convert the original narrow-gauge railroad into a first-class standard-gauge railroad, with full equipment of engines and rolling stock, and pay off all liens prior to the mortgage, in consideration of the bonds and common stock of the consolidated company. It was averred that Kneeland had not performed his contract in respect to the reconstruction and re-equipment of the railroad, and had not paid off some $700,000 of liens which he was bound to discharge, but that through fraud he had procured the issuance to him of the entire issue of bonds, aggregating $9,000,000, and of the entire common stock of $11,250,000, and $1,000,000 in preferred stock, and that the value of things done in the performance of his contract did not exceed $5,000,000, and that he had therefore received the bonds for about one-third of their par value, in violation of the laws of Ohio, Indiana, and Illinois. It was also averred that the bonds had been taken by their present holders subject to all defenses, and with full knowledge and notice of the facts which made them invalid. By Hamlin's cross bill, it was sought to have an account taken with Kneeland, and the amount received for the bonds ascertained, and the holders of such bonds limited to a recovery of the value received by the company. A lien

second only to the valid bonds was asserted in behalf of the said preferred shares of stock. The lien claimed in behalf of the preferred stockholders arises under the terms set forth in the certificates issued to holders of such stock, which were in the form following:

"Toledo, St. Louis & Kansas City Railroad Company.

"No. ——.                    Preferred Capital Stock.                    10 Shares.

"This is to certify that James M. Quigley or bearer is entitled to ten shares, of one hundred dollars each, of the preferred nonvoting capital stock of the Toledo, St. Louis & Kansas City Railroad Company. This constitutes a lien upon the property and net earnings of the company next after the company's existing first mortgage. It does not entitle the holder to vote thereon. After the first day of January, 1888, it is entitled to and carries interest at the rate of 4 per cent. per annum, payable semiannually, represented by interest coupons attached to this certificate. Such interest is only payable out of the net earnings of the company after the payment of interest upon its existing first mortgage bonds, and the cost of maintenance and operation. A statement showing the business of the company for the half of its fiscal year next preceding shall be exhibited at the office of the company in New York, to the holder of this certificate, at the maturity of each interest coupon, and the net earnings applicable to such interest shall be reckoned for such period. Such interest is not to accumulate as a charge, and the coupons representing unearned interest must be surrendered and canceled on the payment, in whole or in part, of a subsequently maturing coupon. At any time after the first day of January, 1888, this certificate may be converted into the common capital stock of the company. If not converted then, to become a preferred 4 per cent. noncumulative stock. The company will create no mortgage of its main line other than its first mortgage, nor of any part thereof, except expressly subject to the prior lien of this certificate, without the consent of the holders of at least two-thirds of this stock present at a meeting, of which reasonable personal notice must be given to each registered stockholder, and by publication for at least three successive weeks in two leading daily papers, newspapers published in the cities of New York and Boston. One-third of the entire issue of this stock, present in person or by proxy, shall constitute a quorum. Nor will the company increase the issue of these certificates of stock without consent obtained as above. These certificates of stock shall be transferable by delivery or by transfer on the books of the company in the city of New York, after a registration of ownership certified thereon by the transfer agent of the company.

"Countersigned:

"American Loan & Trust Company,                    ————, President.

"By ————.                    ————, Secretary.

"New York, June 19, 1886.

"Shares, $100 Each.

"The Toledo, St. Louis & Kansas City Railroad Company will pay to bearer, on the first day of January, 1898, upon the surrender of this warrant at its office or agency in the city of New York, any amount that may be due hereon, under the conditions set forth in the certificate of stock to which this is attached, not exceeding the sum of twenty dollars.

"Coupon No. 20.                    No. ——.

"Isaac White, Secretary."

The Continental Trust Company answered this Hamlin cross bill, and denied all the averments bearing upon the validity of the bonds. This cross bill was filed in behalf of all holders of preferred stock who might elect to come in as co-complainants, and, by direction of the court, advertisement was made by the master requiring all holders of preferred stock, who desired to become co-complainants with the Hamlins, to do so within a stated time.

One Dana A. Rose, claiming to be a holder of such shares, not content to become a co-complainant with the Hamlins, filed a separate intervening petition, in which he not only attacked the validity of the bonds issued by the railroad company, but the validity of the clause in the preferred stock certificates providing that such stock should be a lien upon the property of the railroad company next after the first mortgage. This, having been filed without

leave, was stricken from the files, and several motions intended to make issues upon the averments of his pleading were denied. This refusal of the court to admit him as a defendant, with the right to file a separate cross bill in behalf of himself and such other holders of preferred shares as might elect to come in under his pleading, is the occasion for a separate appeal by said Rose. Under the creditors' bill of Stout and Purdy, issues as to the validity of the bonds were presented by the answer 5 or intervening petition of the same creditors who had answered the foreclosure bill. These petitions or answer 5 attacked the validity of all the bonds upon the ground that they had been sold for less than 75 per cent. of their par value, in violation of a statute of the state of Ohio, and also attacked the validity of about one-half the bonds upon the ground that they had been sold to a director of the railroad company for less than par, in violation of section 3313, Rev. St. Ohio. Another issue was made between the railroad company and the holders of preferred stock, upon the ground that the clause in the certificates issued making said preferred stock a lien upon the property of the company had been inserted through fraud, and without the authority of the railroad company. Still another issue was tendered by one of the intervening petitions filed in the foreclosure suit by a general creditor of the railroad company, namely, whether or not the Toledo, St. Louis & Kansas City Railroad Company was a corporation de jure or de facto. This attack is based upon the averment that there was no law under which the constituent companies could become a consolidated corporation. An order was made requiring the master in the creditors' suit to make publication requiring all creditors within a given time to file their claims, and giving notice as to the time and place when and where a hearing upon all claims would be had, and fixing a time within which objections to such claims might be filed. Under this order, a large number of claims were filed, including the claim of the mortgage bondholders. Unsecured creditors filed, in opposition to the allowance of the bonds, objections going to the existence of the mortgagor corporation, the validity of the mortgage, and the validity of the bonds. After the issues had been thus made up, motions were filed by the appellants as follows: (1) To dismiss the foreclosure bill for want of jurisdiction, on the ground that the necessary diversity of citizenship did not exist, as shown by the face of the bill; (2) to set aside the order consolidating the creditors' bill with the foreclosure suit. These motions, together with others of like purport, were overruled.

Upon the issues thus raised a vast amount of evidence was filed, constituting now a printed record of 4,000 pages. Upon a final hearing, the circuit court in the foreclosure suit decreed as follows: First. That the entire property of the railroad company was lawfully within the exclusive custody and possession of the circuit court under the creditors' bill of Stout and Purdy, and that this fact gave the court jurisdiction to entertain the subsequent foreclosure bill, notwithstanding the requisite diversity of citizenship did not exist to give the court jurisdiction upon that ground. Second. That the railroad company was, at least, a corporation de facto, and that its corporate character was not open to attack by either the corporation itself, or any stockholder, or any creditor who had dealt with it as such. Third. That the bonds were not sold for less than 75 per cent. of their par value, as charged. Fourth. That none of the bonds had been sold at less than par by the railroad company to a director. Fifth. That the mortgage securing the bonds was valid, and the bonds unaffected by fraud. Sixth. That the holders of preferred stock were entitled to a preference over the common stock in the distribution of the surplus of the railroad company's property, after payment of debts, and might become purchasers of the property at the sale ordered, using their shares to pay their bid, after paying into court in money a sufficient amount thereof to pay off the mortgage debt and all other debts of the railroad company, established in this or the creditors' suit, and all costs, etc., provided they should take the property subject to a lien to secure any other debts of the corporation which might be at any time established as a valid subsisting liability. Seventh. The property was ordered to be sold for the satisfaction of the mortgage debts, costs, preferential claims, and any surplus over and above such secured debts to be paid into the registry of the court for distribution among the general unsecured creditors who had or might establish their claims under the pending

creditors' suit. Eighth. In the creditors' suit the court entered a decree reciting the proceedings in the foreclosure suit, and awarding to the creditors, whose claims had been or might thereafter be established, any surplus arising from the sale in the foreclosure suit.

From both of these decrees the railroad company and certain unsecured intervening creditors have appealed. The Hamlins have appealed from so much of the decree in the foreclosure suit as requires them, if they become purchasers, and use their preferred stock in payment of any part of their bid, to take the property subject to the claims of creditors of the railroad company, to the extent they shall so use such preferred stock. The facts are more fully stated in the two opinions of Taft, circuit judge, reported in 82 Fed. 642, and 86 Fed. 929, both of which opinions are also made a part of this record. These opinions are referred to for a more detailed statement of the facts and issues here involved, so far as not in conflict with the facts as heretofore or hereafter stated in the opinion of this court.

John S. Miller, for Rose.

Lawrence Maxwell, Jr., for Railroad Co.

J. D. Springer, for creditors.

Henry Crawford and E. C. Henderson, for Trust Co.

F. Speigelberg, for intervening and judgment creditors.

J. Treadwell Richards, for the Hamlins.

D. W. Sanders, for creditors.

Before LURTON, Circuit Judge, and SEVERENS and CLARK, District Judges.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The principal questions arising upon the assignment of errors filed by the railroad company or the intervening general creditors are these: (1) Did the court have jurisdiction to entertain the foreclosure suit? (2) If the court had jurisdiction, did it err in hearing and deciding the issues which were raised under the foreclosure suit without deciding all of the issues raised in the creditors' suit? (3) Did the court err in holding that the railroad company was at least a corporation de facto, and in dismissing the intervening petition of the Rhode Island Locomotive Works, based upon the insistence that the consolidated company was not a corporation de jure or de facto? (4) Did the circuit court err in holding that the bonds were not illegal under section 3290, Rev. St. Ohio? (5) Did the circuit court err in holding that the bonds were not void for violation of section 3313, Rev. St. Ohio? (6) Did the court err in holding that the preferred stockholders were entitled to a preference in the distribution of the property of the corporation, after the payment of debts, over the common stockholders? These questions can be most conveniently discussed in the order in which they have been stated, and in connection with such further facts as have application to the particular question.

1. As to the jurisdiction of the court to entertain the foreclosure bill: The foreclosure bill was not a suit between parties having the requisite diversity of citizenship to give a court of the United States jurisdiction upon that ground. The jurisdictional fact averred in the bill was the fact that the property covered by the mortgage was within the actual custody and control of the court in which the

bill was filed, and was being operated under the order of the court by a receiver, whose custody was that of the court. The court's possession had been taken under a creditors' bill filed by Stout and Purdy, judgment creditors of the mortgagor railroad company, and was filed for the purpose of winding up the affairs of the company as an insolvent corporation, by marshaling liens, ascertaining debts, and bringing to sale the property of the company for distribution among all creditors who should come in according to their respective priority and right. That suit was, in every sense of the term, an administrative suit, brought not only for the benefit of Stout and Purdy, but of all other creditors of said railroad company. The required diversity of citizenship existed, and justified its being filed in a court of the United States. Under it the circuit court possessed full, complete, and exclusive jurisdiction and power to deal with the property of that company, and with all interests in it and with all controversies respecting it. Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008. The priority of the mortgage and the validity of the bonds were admitted on the face of the bill, and, although the object of the suit was to ascertain all debts and marshal all liens, the mortgagees were not made defendants. To have done so would have defeated the jurisdiction, by making defendants persons whose citizenship was identical with that of the complainants. In this situation the mortgagees applied to the court for leave to file a bill to foreclose their mortgage. This exclusive custody and possession of the res by the court made the fact immaterial that some of the necessary defendants to the foreclosure suit were citizens of the same state of which one of the mortgagees was a citizen. The jurisdictional fact lies in the subject-matter of the litigation, which was a claim against property in custodia legis. It is true that the court might have permitted the mortgagees to become parties to the creditors' suit by petition pro inter esse suo, and to have filed a cross bill for the foreclosure of their mortgage. In Morgan's L. & T. R. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171–201, 11 Sup. Ct. 61, a cross bill was filed by a mortgagee brought before the court as a defendant by supplemental pleading under a bill filed by a creditor claiming priority over the mortgage. The mortgagee answered, and filed a cross bill for the foreclosure of the mortgage, and this was done. The supreme court was urged to reverse the decree of foreclosure upon the ground that the pleading under which foreclosure was ordered was not a cross bill, pure and simple, and, treated as an original bill, it could not have been maintained, for want of requisite diversity of citizenship. This contention was overruled, and the jurisdiction maintained, the court saying:

"And whether this bill will be regarded as a pure cross bill, as an original bill in the nature of a cross bill, or as an original bill, there is no error calling for the disturbance of the decree, because the court proceeded upon it in connection with the other pleadings. The jurisdiction of the circuit court did not depend upon the citizenship of the parties, but on the subject-matter of the litigation. The property was in the actual possession of that court, and this drew to it the right to decide upon the conflicting claims to its ultimate possession and control. Minnesota Co. v. St. Paul Co., 2 Wall. 609; Bank v. Calhoun, 102 U. S. 256; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27."

To the same effect are the cases of Gumbel v. Pitkin, 124 U. S. 131–156, 8 Sup. Ct. 379; Byers v. McAuley, 149 U. S. 608–618, 13 Sup. Ct. 906; Rouse v. Letcher, 156 U. S. 48, 15 Sup. Ct. 266.

The identical question arose in this court in the case of Compton v. Railroad Co., 31 U. S. App. 486, 522, 529, 15 C. C. A. 397, and 68 Fed. 263, where an original foreclosure bill was filed, and jurisdiction maintained solely upon the ground that the property was within the possession of the court through a receiver appointed in another foreclosure case. That case has been approved and followed in Lumley v. Railroad Co., 43 U. S. App. 476, 22 C. C. A. 60, and 76 Fed. 66, and in Blake v. Coal Co., 47 U. S. App. 753, 28 C. C. A. 678, and 84 Fed. 1014, where Judge Hammond, for the court, said, "Whether the auxiliary jurisdiction be marked by original bill, cross bill, or by intervening petition, diversity of citizenshp is not necessary to its maintenance."

2. Appellants contend that, if the foreclosure proceedings were in any sense of a dependent character, a single decree should have been entered, determining all the rights, equities, and priorities of all the creditors of the insolvent debtor, and that any creditor intervening in the creditors' suit was entitled to contest the claims of every other creditor coming into that suit, and that no proper decree could be entered until the amount and rank of every claim so filed had been determined, and all objections to such claims had been determined, and that the foreclosure decree was therefore premature and erroneous. We quite concur in the view taken by the circuit court of the relation of the one suit to the other, and of the consequences of this sort of jurisdictional dependency. In justification of the order allowing the foreclosure suit to be filed as an independent bill, and directing consolidation of the creditors' suit with, and under the style of, the foreclosure suit, the circuit judge said:

"It cannot be of importance that the bill was apparently filed as an independent bill. If, in fact, the only way of maintaining jurisdiction of it is as a dependent bill, ancillary to the creditors' action, it is the duty of the court so to treat it, provided it appear, as it does, that it can be maintained as such. But care must be taken not to give too much effect to the dependence of one suit on the other for jurisdictional purposes. Such dependence does not throw both suits into hotchpot, and dispense with the ordinary rules of pleading and practice as to parties proper and necessary to each cause of action. Because the res acquired under the original bill gives ancillary jurisdiction to entertain a dependent bill seeking relief in respect of the res, parties to the original bill are not thereby made parties to the dependent bill. The parties to the original bill have no more right to intervene in the dependent cause than if the court had independent jurisdiction thereof. Hence the rule as to who may appear to a foreclosure bill and file answers is the same here as if the bill had in fact been an independent bill. In other words, the relation between the two suits is principal and ancillary only so far as that, without possession of the res in the former suit, the court would have no jurisdiction of the latter; but, having thus acquired and thus maintaining its jurisdiction in the second suit, the court proceeds in it without further regard to the pleading or course of the principal action." Continental Trust Co. v. Toledo, St. L. & K. C. R. Co., 32 C. C. A. 44, 87 Fed. 133.

It was not error, therefore, to hear the foreclosure suit upon the issues properly made between those who were parties to that suit. Nor was it necessary that the court should refuse a decree enforcing

the mortgage because the rank and amount of other claims filed in the creditors' suit had not been ascertained. The mortgage debt, if valid, was the prior lien; and we know of no principle which would require the court to refuse a decree of foreclosure because there were unsettled controversies between the mortgagor and unsecured creditors, or between the company and different classes of stockholders. The very object in filing an original foreclosure suit was to avoid the delay and complications incident to a general administration suit. This object would be utterly defeated if the contention of appellants is to be sustained. The consolidation of the two suits was within the sound discretion of the court. Section 921, Rev. St. U. S., applies as well to suits in equity as suits at law. Fost. Fed. Prac. § 371; Andrews v. Spear, 4 Dill. 472, Fed. Cas. No. 379; Wabash, St. L. & P. Ry. Co. v. Central Trust Co., 23 Fed. 513. Such consolidation is primarily but an expedient adopted for saving costs and delay. Each record is that of an independent suit, except in so far as the evidence in one is, by order of the court, treated as evidence in both. The consolidation does not change the rules of equity pleading, nor the rights of the parties, as those rights must still turn on the pleadings, proofs, and proceedings in their respective suits. The parties in one suit do not thereby become parties in the other, and a decree in one is not a decree in the other, unless so directed. It operates as a mere carrying on together of two separate suits supposed to involve identical issues, and is intended to expedite the hearing and diminish the expense. Brevard v. Summar, 2 Heisk. 97–105; Lofland v. Coward, 12 Heisk. 546. The practice seems to be one not well established in English courts of equity, and, though admissible, to be sparingly exercised, inasmuch as it may often operate to force litigants together against their will, and without real advantage. Knight v. Ogden, 3 Coop. 409. The bringing on of the two suits for hearing together does not avoid the necessity of separate decrees in each case. Nor does the fact that the two suits have been consolidated require that every issue under each suit should be heard at the same time. So far as these suits turned upon the same issues, they were heard together, and the decree respecting those issues was entered in each case. We see no error in the refusal of the court to suspend a final decree in the foreclosure suit to await a final decree upon all the issues arising upon the numerous interventions in the creditors' suit. So far as such issues were common, as involving the validity of the bonds, they were heard and decided.

3. Certain general creditors, parties to the foreclosure suit, have challenged the validity of the agreement under which the Toledo, St. Louis & Kansas City Railroad Company claims existence as a valid consolidated corporation of Ohio, Indiana, and Illinois. This consolidated corporation was organized June 19, 1886, the constituent companies being the Toledo, Dupont & Western Railway Company of Ohio, a corporation owning that part of the consolidated line lying within the state of Ohio; the Bluffton, Kokomo & Southwestern Railroad Company of Indiana, a corporation owning that part of the consolidated line lying within Indiana; and the Toledo,

Charleston & St. Louis Railroad Company of Illinois, a corporation owning that part of the consolidated road lying in the state of Illinois. These creditors aver that the purported consolidation of these constituent companies was illegal and unauthorized by any law of the states within which said railways exist, and that the said Toledo, St. Louis & Kansas City Railroad Company is neither a corporation de jure nor de facto. Upon this ground these defendants or petitioners aver that the mortgage made by the consolidated company is void, and the bonds secured thereunder unenforceable. All of the appellants who made this question dealt with the consolidated company as a corporation, and all hold claims for debts contracted by it as a corporation. It is not debatable but that a de facto corporation is estopped to deny its existence as a corporation for the purpose of defeating liability upon contracts incurred by it while pretending to be acting as a corporation. The same estoppel extends to the stockholders of such a de facto corporate organization, and to other persons who have dealt with it as such. Mor. Priv. Corp. § 750; Commissioners v. Bolles, 94 U. S. 104; Close v. Cemetery, 107 U. S. 466-477, 2 Sup. Ct. 267; Ashley v. Board, 16 U. S. App. 656, 8 C. C. A. 455, and 60 Fed. 55; Farmers' Loan & Trust Co. v. Toledo, A. A. & N. M. Ry. Co., 67 Fed. 49; Dallas Co. v. Huidekoper, 154 U. S. 654, 14 Sup. Ct. 1190; Society Perun v. Cleveland, 43 Ohio St. 481, 3 N. E. 357; Andes v. Ely, 158 U. S. 312-322, 15 Sup. Ct. 954. It is not contended that there was not authority under the law of Indiana to bring about a consolidation. The contention is that there was no authority under either the law of Illinois or Ohio to authorize a consolidation of the constituent companies comprising the mortgagor consolidated company. There was at the time of the consolidation in question a statute of the state of Illinois which provided as follows:

"Whenever any railroad which is situated partly in this state and partly in one or more other states, and heretofore owned by a corporation formed by consolidation of railroad corporations of this and other states, has been sold pursuant to the decree of any court or courts of competent jurisdiction, and the same has been purchased as an entirety, and is now or hereafter may be held in the name or as the property of two or more corporations incorporated, respectively, under the laws of two or more of the states in which said railroad is situated, it shall be lawful for the corporation so created in this state to consolidate its property, franchises and capital stock with the property, franchises and capital stock of the corporation or corporations of such other state or states in which the remainder of such railroad is situated, and upon such terms as may be agreed upon between the directors and approved by the stockholders owning not less than two-thirds in amount of the capital stock of such corporation." 3 Starr & C. Ann. St. Ill. p. 3241.

## Section 3380 of the Revised Statutes of Ohio was in these words:

"A company organized in this state for the purpose of contracting, owning and operating a line of railway, or whose line of road is made or is in process of construction to the boundary line of this state, or to any point either in or out of the state, may consolidate its capital stock with the capital stock of any company in an adjoining state organized for a like purpose, and whose line of road has been perfected, constructed, or is in process of construction to the same point where the several roads, so united and constructed, will form a continuous line for the passage of cars."

The contention is that the constituent companies forming the present consolidated company did not have the requisites essential to a valid consolidation under the law of either state. This Illinois act set out above was evidently intended to permit the reconsolidation of the dismembered constituents of a former consolidated line, where the original consolidation included an Illinois railroad, and where such consolidated line has been sold as an entirety, and is at the time held as the property of two or more corporations under the laws of two or more states. If, therefore, we find that the constituent companies which undertook to unite themselves by a consolidation had theretofore been so united as to constitute a consolidated railroad company, and that their original union had been dissolved as a consequence of judicial sale, and that the original consolidated line had been "purchased as an entirety," and was at date of reconsolidation "held in the name or as the property of two or more corporations incorporated, respectively, under the laws of two or more of the states," all the conditions would exist which under the law of Illinois would authorize the organization of a de jure consolidated corporation. But suppose some one of these conditions did not in fact exist, and that, notwithstanding this absence of some of the qualifications prescribed, a consolidated corporation had been organized, claiming to be a consolidated corporation under the law of Illinois; will the fact that the organization thus formed would not be a de jure corporation operate to deprive the company so organized of its character as a de facto corporation? We think not. The fact that there might be under the law of Illinois a consolidated company composed of an Illinois corporation and corporations of other states, with the powers claimed by the Toledo, St. Louis & Kansas City Railroad Company, would constitute it a de facto corporation, although the particular companies thus united might not possess all of the qualifications required by the Illinois statute. A defect in the qualification of some of the constituent companies might affect the de jure character of such an organization, and, when challenged by the state, demand a judgment of ouster. The test of a de facto corporation is this: Was there a law under which there might have been a de jure corporation of the kind, character, and class to which the organization in question apparently belongs? It is the apparent legality of the organization which gives it its de facto character. If there was no law under which an Illinois consolidated corporation could exist, there could be no de facto consolidated corporation. The possibility of a de jure corporation is the only condition requisite to a de facto corporation. It is not a sound test that the particular constituents could not have become a de jure consolidated corporation. That would open every such organization to parol attack, and destroy its de facto character, not by showing the impossibility of a de jure corporation of the kind in question, but by evidence affecting the internal history of the parts composing the whole. Suppose the law had permitted any two non-competing railroad companies to consolidate; would it be admissible to destroy the de facto consolidation of two railroad corporations by evidence that they were in fact competing companies? We think

not. The sovereign power of the state might by a proper proceeding dissolve the union, as one not authorized by law; but neither the corporation itself, nor its members, nor those who dealt with it as a corporation, would be allowed to deny its de jure character for the purpose of defeating liabilities incurred in its character as a corporation. The cases of State v. Vanderbilt, 37 Ohio St. 590, and State v. Atchison & N. R. Co., 24 Neb. 143, 38 N. W. 43, hold that the consolidation of railroads not forming continuous lines, where the statute makes that a condition or qualification, were both suits by the state, directly and not collaterally attacking the de jure character of the consolidation. We find nothing in the case of Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121, which militates against this conclusion. The court was there dealing with the validity of the acts of persons claiming to be de facto incumbents of an office which did not and could not exist de jure. But the whole line of reasoning adopted by the court, and the general trend of the cases cited, establish the proposition that the disqualification of the particular incumbent to be a de jure officer will not affect the validity of the acts of the incumbent, if there was a de jure office. The cases of Carleton v. People, 10 Mich. 250–259, Clark v. Com., 29 Pa. St. 129, and Blackburn v. State, 3 Head, 690, all illustrate the proposition that the incumbent of an office is a de facto officer, notwithstanding his personal disqualification or the illegality of his appointment, when there is a de jure office. The principle has application to the question of the de facto character of a corporation. The disqualification of the corporators or of the constituents composing a consolidated corporation does not affect the validity of the acts and contracts of the organization, if there was a law under which there might have been a de jure consolidated corporation of the class to which the de facto corporation belongs. This question was directly considered by this court in the case of Ashley v. Board, 16 U. S. App. 656–668, 8 C. C. A. 455, and 60 Fed. 55,—a case in which was involved the validity of bonds issued by the county of Presque Isle, in the state of Michigan. It was claimed that the bonds were void because the constitutional conditions did not exist necessary to the organization of the territory constituting that county into a de jure county. This court held that this fact of the ineligibility of the territory constituting the county for legal organization into a constitutional county could not be inquired into by anybody save the state, and that a corporation was a de facto corporation, which "is of a kind which is recognized by, and its existence consistent with, the paramount law and the general system of law in the state."

The principles we have been discussing have application to the objections urged against this consolidation under both the Illinois and Ohio law. The objections made to the eligibility of the constituent companies to unite themselves as a consolidated corporation under the Illinois law above set out are these: First, that the railroad now owned by the Toledo, St. Louis & Kansas City Railroad "was not owned, prior to the attempted consolidation, by a corporation formed by consolidation of railroad corporations of Illinois and other states." The fact is that prior to 1886 there was a line of narrow-gauge rail-

road extending from Toledo, in Ohio, across the states of Indiana and Illinois, to East St. Louis, on the western border of the latter state. That railroad was 450 miles in length, and is the same railroad owned and operated by the present consolidated company. Prior to 1886 it was owned or operated as one line by a consolidated corporation of the states of Illinois, Indiana, and Ohio, called the Toledo, Cincinnati & St. Louis Railroad Company, called hereafter, for brevity, the "Narrow-Gauge Company." Counsel for appellants say that the Narrow-Gauge Company "did not own a section thereof sixty-seven miles in length, extending from the city of Frankfort, Indiana, to the boundary line between the states of Indiana and Illinois." It would uselessly incumber this opinion to set out at length the precise relations and rights of the Narrow-Gauge Company to and in this link of 67 miles. It is enough to say that the legal title to that section was in a corporation of Indiana known as the Frankfort & State Line Railroad Company. This company entered into a contract for the construction of its line of railroad with a construction company, whereby it agreed to execute a mortgage and issue its bonds, and to deliver them to the construction company, together with all of its shares of capital stock, save a small proportion necessary to fulfill contracts with municipal subscribers to its stock. This line of projected railway was identical with part of the line projected by the Narrow-Gauge Company, and the latter company contracted with the same construction company for the construction of a division of its line 270 miles in length, which included the section covered by the line of the Frankfort Company's railroad. Under an agreement between the Narrow-Gauge Company upon the one side, and the construction company on the other, known to and approved by the Frankfort Company, the latter did not make a mortgage or execute any bonds as contemplated, but the Narrow-Gauge Company assumed the debts and liabilities of the Frankfort Company to the construction company, and the latter company assigned to the Narrow-Gauge Company the capital stock of the Frankfort Company, and received in payment for the construction of the Frankfort Company's part of the line, and in performance of its contract with the Frankfort Company, the mortgage bonds of the Narrow-Gauge Company. All this was done with the full knowledge and agreement of the Frankfort Company, and with the mutual purpose and understanding that there should be a technical consolidation of the two corporations. When the road was constructed, it was turned over to the Narrow-Gauge Company, and operated as a part of its line of railroad. The actual technical consolidation was postponed on account of its possible effect upon certain municipal subscriptions to the capital stock of the Frankfort Company. Having paid for the construction of the Frankfort Company's railroad under the arrangement stated, having assumed all the obligations of the Frankfort Company, and being the owner of practically all of its capital stock, and in possession and operation under an agreement for a future consolidation of that section as a part of its own line, we are of opinion that this equitable ownership of that section was sufficient to constitute it a part of a railroad "heretofore owned by a corporation formed by consolidation

of railroad corporations of this [Illinois] and other states," within the meaning and fair intent of the Illinois act, and that the mere outstanding legal title to that section affords no solid objection to the eligibility of the constituent companies to organize a de jure consolidated corporation under the law of Illinois.

But it is said that the old consolidated narrow-gauge railroad was not "purchased as an entirety," under the decree of a court having jurisdiction. It appears that the narrow-gauge railroad company had mortgaged its railroad as two separate divisions. That part of its line from Toledo to Kokomo was known and mortgaged as its "Toledo Division," and that portion from Kokomo to East St. Louis was known and separately mortgaged as its "St. Louis Division." These two mortgages were necessarily foreclosed under distinct decrees. These two divisions were sold on the same day, and confirmed on the same day, to Sylvester H. Kneeland, and both divisions were conveyed to him by a single master's deed, dated March 10, 1886. Subsequently Kneeland organized a corporation in Ohio, to which he conveyed so much of this line as was situated in Ohio, and also organized corporations in Indiana and Illinois, to which he conveyed, respectively, so much of the said railroad as was situated in each state. In thus buying said entire line of railroad, Kneeland was acting as the trustee for the holders of all the bonds, and with a view and under a contract for a reorganization and reconstruction of said line of road, and in accordance with this purpose and agreement of the beneficial owners, these three constituent companies were afterwards consolidated, and became the present mortgagor consolidated company.

Upon the facts stated, we hold that the said railroad was "purchased as an entirety," within the meaning of the Illinois statute, and that the constituent companies were, under that statute, eligible to form a de jure consolidated corporation. Thus is it to our minds clear that, under the law of both Indiana and Illinois, a de jure consolidation was not only possible, but was a fact brought about. But it is said that the Ohio statute only permits the consolidation of an Ohio corporation with that of an adjoining state, and that, Illinois not being adjoining to Ohio, the attempted consolidation was unwarranted. Concededly, the Ohio company could have consolidated with the Indiana company. So, the Indiana company could have consolidated with the Illinois company. The objection goes, then, only to the order in which these three companies united themselves. If the Indiana company had first united itself with the Illinois company, and that act had preceded its union with the Ohio company by but a single instant, no objection would lie. But, when the union of the Ohio corporation with the Illinois corporation occurred, it was a result of a coincident union of the Ohio company with the Indiana company, which was a corporation of an adjoining state. Such a simultaneous union with two companies, one being a corporation of an adjoining state, was a substantial compliance with the Ohio law, the prime object of which was to limit consolidation to connecting lines. The consolidation resulted in a de jure corporation.

4. This brings us to the question of the legality of the bonds issued

by the consolidated company under section 3290, Rev. St. Ohio. That section is as follows:

"The directors of the company may sell, negotiate, mortgage or pledge such bonds or notes, as well as any notes, bonds, scrip or certificates for the payment of money or property which the company may have theretofore received or shall hereafter receive as donations, or in payment of subscriptions to the capital stock, or for other dues of the company, at such times and in such places, either within or without the state, and at such rates and for such prices, at not less than seventy-five cents on the dollar, as in the opinion of the directors, will best advance the interests of the company; and if such notes or bonds are thus sold at a discount, without fraud, the sale shall be as valid in every respect, and the securities as binding for the respective amounts thereof, as if they were sold at their par value."

The facts essential to be understood which have direct relation to this question were clearly and compactly stated in the opinion of the circuit judge, and are as follows:

"In 1882 the railroad that is the subject of this litigation was a narrow-gauge line, running from Toledo to St. Louis, and was owned by the Toledo, Cincinnati & St. Louis Railroad Company, a consolidated corporation of Illinois, Indiana, and Ohio. It was 450 miles in length. It had a total mortgage indebtedness of about $10,000,000, and a capital stock of the par value of $21,000,000. It was divided into two divisions. By two agreements, two committees, of five members each, were constituted to protect their respective interests in the purchase of the two divisions of the road then about to be sold, and to effect a reorganization of the two divisions, united in one road, upon a plan stated in the agreements. The plan embraced the issue of first mortgage bonds to the extent of $15,000 a mile with which to rebuild and widen the gauge of the road, and the issue of $7,000,000 of second mortgage bonds with which to take up the first mortgage bonds of the two divisions. The agreement gave the trustees very wide powers and discretion in the working out of the scheme of reorganization. In the latter part of 1885, James M. Quigley, who was chairman of the two committees, made a preliminary contract with S. H. Kneeland, by which Kneeland agreed to bid in the two divisions of the old road at the foreclosure sale, to be held in the following January, and to advance the cash which it was necessary to deposit in order to become a bidder at the sale. The preliminary agreement looked to a subsequent agreement by which Kneeland was to be given the first mortgage bonds on the narrow-gauge road, and with them to assume all the obligations of the purchaser imposed by the decree for sale, to convey the road to a newly-organized consolidated corporation of Ohio, Indiana, and Illinois, and, as contractor, to rebuild the road and widen its gauge. Kneeland made the necessary deposits, and bid in the two divisions at the sale. Upon January 23, 1886, after the sale, he made with the two bondholders' committees the two contracts under which the bonds here in controversy were subsequently issued. The agreements are in all substantial respects similar. By these contracts, Kneeland on his part agreed: (1) To complete the purchase in accordance with the terms of the decree, which required the purchaser to pay off receiver's certificates and other underlying liens prior in right to the first mortgage bonds. (2) To form three corporations, of Ohio, Indiana, and Illinois, respectively, to each of which he would convey the part of the road lying in the state of its organization, and then to consolidate them into a corporation of the three states. (3) That the consolidated corporation should change the gauge of the road from narrow to standard width; lay down steel rails of not less than 60 pounds to the yard of main line; widen all embankments and cuts to the requisite width; widen, strengthen, and rebuild bridges as the same might be necessary; construct all necessary stations, tanks, houses, repair shops, and sidings, so that the said road, reaching from Toledo to East St. Louis, should 'in all respects be a first-class road of standard gauge'; equip the road with all necessary cars of every description, and with requisite motive power; and use, of the $1,000 bonds of the company to be issued, the proceeds of at least four per mile in the purchase of the equipment. (4) Kneeland agreed to complete the construction and equip-

ment, and deliver the road to the new consolidated company, on or before the 1st of July, 1888, unless he encountered unforeseen obstacles, in which case the bondholders' committees were to have the power to extend the time for one year. (5) To pay the interest that might accrue on the newly-issued mortgage bonds, pending the periods of construction. The net earnings of the company during this period were to be devoted to such betterments as seemed desirable to the company. (6) To pay all the expenses of the two committees in litigation and reorganization and their compensation. It was further provided that, as a consideration for the performance of these obligations, the consolidated company would be required (1) to issue $9,000,000 of 6 per cent. bonds, or $20,000 a mile, secured by a first mortgage; (2) to issue $5,805,000 of nonvoting stock, in $100 shares, having coupons attached payable semiannually, at the rate of 4 per cent. per annum if earned, but noncumulative, and convertible into common stock after five years, and before ten years, and, if not converted, to become a preferred 4 per cent. noncumulative nonvoting stock; (3) to issue $11,250,000 of common stock, or $25,000 a mile; (4) to issue the bonds, preferred stock, and common stock at once to two trustees, one to be selected by Kneeland, and the other by the bondholders' committee, for distribution. According to the contract, the trustees were (1) to deliver to Kneeland $2,000,000 in bonds and $2,500,000 in common stock at once; (2) thereafter, as the work of construction and equipment progressed, to deliver the remaining bonds and common stock to Kneeland according to the value of the work done and equipment furnished, as certified by the chief engineer of the company; (3) to deliver $1,000,000 of the preferred stock to Kneeland to aid in the purchase and payment of the underlying liens, as the satisfaction of the same should be certified by the clerk of the court; (4) to deliver $4,805,000 in preferred stock to the holders of the old narrow-gauge first mortgage bonds, on the basis of 15 shares, of $100 each, for one bond of $1,000 on one division, and 10 shares for one bond on the other division. It is further provided that the bondholders' committee (1) should deliver all their first mortgage narrow-gauge bonds to Kneeland to enable him to complete his contract of purchase; and (2) should litigate all claims made for liens prior to these bonds as he should request, but at his expense.

"Soon after the signing of the contracts, Kneeland proceeded to organize three corporations,—one of Ohio, called the Toledo, Dupont & Western Railway Company; one of Indiana, called the Bluffton, Kokomo & Southwestern Railroad Company; and one of Illinois, called the Toledo, Charleston & St. Louis Railroad Company. To the first, by deed of June 12, 1886, he conveyed all of the railroad lying in Ohio in consideration of all its capital stock; to the second, by deed of June 11, 1886, he conveyed all of the railroad lying in Indiana in consideration of all its capital stock; and to the third, by deed of April 1, 1886, he conveyed all of the railroad lying in Illinois in consideration of its capital stock. At the same time he made contracts with the three companies of a similar character. It will be sufficient to state briefly his contract with the Ohio company. The recitals refer to the foreclosure proceedings of the old narrow-gauge consolidated company, the Toledo, Cincinnati & St. Louis, and Kneeland's purchase of the railroad at the foreclosure sale. Kneeland agreed to convey the Ohio part of the railroad to the Ohio company; agreed that the companies of Indiana and Illinois organized by him, to whom he would convey or had conveyed the remainder of the road, would consolidate with the Ohio company, so that a new consolidated company should become the owner of the continuous line from Toledo to East St. Louis; and agreed that the consolidated company should, without delay, broaden the gauge of the road to a standard gauge, should lay the track with steel rails weighing not less than 60 pounds to the yard, and should make said line a first-class standard-gauge railroad in all respects, and equip the same with proper rolling stock and motive power. The Ohio company, on its part, agreed—first, to issue all its capital stock to Kneeland; second, agreed that the consolidated company, formed as before provided, should issue, in full and complete payment for the broadening of the gauge, the reconstruction of the railroad, and its equipment, 'and for the purpose of exchanging some of said stock and securities with the holders of certain securities issued by the companies heretofore owning and controlling said railroad and property, or portions thereof, for the payment of certain debts,

95 F.—33

underlying liens, rights of way, and other corporate purposes,' $9,000,000 of bonds, $11,250,000 of common stock, and $5,805,000 of preferred coupon convertible stock. The three corporations were then consolidated, and the organization of the new company was effected on the 19th of June, 1886. The articles of incorporation of the consolidated company described the preferred stock as follows: 'Of said capital stock, $5,805,000, being 58,050 shares thereof, shall be four per cent. preferred coupon convertible stock, with right to vote only after conversion.' The articles of association of the consolidated company provided that the first board should consist of James M. Quigley, Isaac W. White, and Robert G. Ingersoll, of New York, together with ten others named thereof, and that the first officers of the company should be James M. Quigley, president, and Isaac W. White, secretary and treasurer. The first meeting of the stockholders and directors was held on the 19th of June, and Quigley was elected president, and White secretary and treasurer, accordingly. The board of directors then passed resolutions authorizing the issue of the bonds and stock provided in the articles of association and the contracts of January 23, 1886. There was no formal confirmation of the contracts of January 23, 1886, by the board of directors of the company, but they proceeded at once to conform to the provisions of the contracts in the issue of the stock and bonds, and in their delivery to trustees. Kneeland selected Robert G. Ingersoll as his trustee, and the bondholders' committee selected Isaac W. White as their trustee, the two to hold the bonds and stock, and deliver the same to Kneeland, as the contract required."

The negotiable character of these bonds has been questioned, because it is said the time of payment is uncertain, in view of the option given to the holders of one-half the entire issue to precipitate their maturity for default in interest, and because the amount payable is uncertain, in view of the provision that "all payments of principal and interest shall be made free and clear of all taxes." We express no opinion upon this question, as we find it unnecessary, in view of our conclusions upon the question of the legality and validity of the bonds themselves.

The bonds and stocks thus placed in the hands of Ingersoll and White, as trustees, were from time to time, as the work of reconstruction and re-equipment progressed, delivered to Kneeland, and have passed finally into the hands of holders, many of whom are unknown. The contention is that the railroad company did not realize for its bonds the minimum price at which the bonds might be sold under this contract with Kneeland, and that, therefore, the holders of these bonds who do not establish their title as bona fide holders, for value and without notice, can, at most, recover only the actual money value or money's worth received by the company, and not the amount of their investment. Without at this point deciding whether this question has been properly raised or can be by any of the appellants, we shall examine the question upon its merits. The trial court found upon the evidence that the money value of that which Kneeland did under his contract and the money value of the benefit received by the company for the bonds amounted to the price of 76.6 per cent. of the par of the bonds, and that there had been, therefore, no violation of this provision of the Ohio law. After a careful consideration of this vast volume of evidence, we concur with the circuit court in finding that the price realized by the company for their bonds was in excess of the limit fixed by the Ohio statute. The amounts paid out by Kneeland in performance of his contract, as found by the circuit court, aggregated $10,305,106. This consisted of the following items:

Construction disbursed through Crowell......................... $ 3,509,317
Steel rails.................................................... 1,528,179
Iron bridges, etc.............................................. 500,000
Allowed by Kneeland for completion of road..................... 100,000
For interest on bonds down to June 1st, 1891................... 1,766,465
For equipment................................................. 1,314,071
For lien claims prior to mortgage............................. 650,247
Profit—10 per cent. on cash paid out.......................... 936,827

                                                            _____
                                                            $10,305,106

From this aggregate value of benefits received the court deducted the following items, in order to arrive at the net value actually received by the company for its bonds:

Market value of common stock issued to Kneeland at 15 per cent.... $1,687,500
Market value preferred stock issued to Kneeland at 30 per cent...... 300,000
Value of old materials received by him........................... 200,000
Net earnings received by him for year ending June 30, 1889........ 200,000
Net earnings received by him for year ending June 30, 1890........ 470,352
Net earnings received by him for year ending June 30, 1891........ 549,962

                                                            _____
                                                            $3,407,814

This aggregate of payments to Kneeland, other than in bonds, being deducted from total value of benefits received by the company under the contract with Kneeland, leaves $6,897,292, which is the value actually received by the company for $9,000,000, or 76.6 of par. The criticism of counsel for appellants upon this method of arriving at the consideration received for the bonds is chiefly this: That the bonds and the stock furnished, together, the consideration paid Kneeland for the construction and equipment of the road, and for the payment of the preferential liens upon the property of the old company, and that, if any apportionment is to be made, the only one which would carry out the intention of the parties "would be to apportion the consideration ratably upon the three classes of securities." Thus apportioned, the consideration for the bonds would necessarily be less than 75 per cent. of par. We are unable to appreciate this objection. To adopt such a construction of the contract of January 23, 1886, would be to assume that the parties attached a value to the stock which it did not have, and which could not have been obtained. The common stock had little, if any, actual value, and only such market value as Kneeland's dealings in it created for it. This value the court found to be 15 cents upon the dollar. This is a liberal allowance. The preferred stock had a probable market value of 30 per cent. No statute forbade the sale of either class of stock at its marketable value, either for money or in payment for construction of its railroad, unless section 3313, Rev. St. Ohio, forbidding a sale of bonds or stock to a director, has application to such a contract as was made with Kneeland, when made with a director. In Fogg v. Blair, 139 U. S. 118–126, 11 Sup. Ct. 476–478, the bill of a judgment creditor was dismissed upon demurrer which averred that the defendant had received for construction work the mortgage bonds of the company to the full value of the work done, and capital stock to a like amount as a bonus. The court said that it was competent for the company to use its bonds and stock in payment for the construc-

tion of its road. But that it could not do so without exercising good faith, and obtaining a reasonable equivalent. In discussing the question of the value of the stock, Justice Harlan said:

"What was such an equivalent depends primarily upon the actual value of the stock at the time it was contracted to be issued, and upon the compensation which, under all the circumstances, the contractors were equitably entitled to receive for the particular work undertaken, or done by them."

It is impossible to suppose that the parties intended to treat these securities as of equal actual or market value, and there is no reason why so improbable a view of the contract shall be taken.

There is, however, a view of the contract under which the price received for the bonds and stock together would be the reconstructed and re-equipped railroad. The contract with Kneeland was but a plan for the reorganization and sale of the old narrow-gauge railroad, reconstructed and re-equipped. The original parties thereto were the first mortgage bondholders of that company, acting through their committee, and S. H. Kneeland. The plan was that Kneeland should buy in the mortgaged property for them, for this purpose using their bonds as far as they would go in satisfying his bid, and advancing for them the cash necessary to make the requisite money payment required by the decree of foreclosure, and for paying the claims adjudged to be entitled to priority over their bonds. Thus these mortgage bondholders were to become, through Kneeland's purchase, the beneficial owners of the narrow-gauge railroad. But the scheme went further. There was to be organized a corporation to which these owners should convey this property for purposes of operation. Hence the agreement that Kneeland should first organize three corporations, one in each state within which the road was situated, and convey to each such corporation that part of the railroad within the state of each corporation, and then consolidate these companies, so that the road in its entirety should be held by one corporation organized under the law of each state. The conversion of this narrow-gauge road into one of standard gauge, and to re-equip it according to the necessities of the changed gauge, was deemed wise and prudent in order to secure the possibility of some return for the large investment by these beneficial owners. Thus a part of the plan of reorganization required that the road should be reconstructed and re-equipped, that it might be in all respects a first-class standard-gauge railroad. This Kneeland also undertook to do, and the method adopted was that the consolidated company should obligate itself to the constituent companies to thus reconstruct and re-equip the said railroad. For this purpose, and for the purpose of paying to the beneficial owners of the old property the price for which they consented to sell the same to the reorganized company, the consolidated company was obligated, as a condition upon which it received this property, to issue $9,000,000 of first mortgage bonds, $11,250,000 of common stock, and $5,000,000 of preferred stock; making a total capitalization of $25,250,000. This, in the last analysis, constituted the price to be paid for this property in its reorganized, reconstructed, and re-equipped condition, and was a price which the beneficial owners of the property required the reorganized corporation to pay for

the property.    The price was to be distributed thus:    To Kneeland, in consideration for the payment of all costs and liens prior to the mortgage bonds, and for the re-equipment and reconstruction of the railroad, and in consideration that he would pay the interest on the bonds during the period of reconstruction, $9,000,000 of mortgage bonds, $11,250,000 of common stock, and $1,000,000 of preferred stock.    To the old mortgage bondholders, for their interest in the old property, $4,000,000 in preferred stock.    It is difficult to see any solid distinction between this reorganization contract and that sanctioned in Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482.    That case involved the reorganization of an Arkansas railroad which had been bid in by a trustee for the bondholders at a foreclosure sale, and subsequently conveyed by the trustee to a new corporation in consideration for the bonds and stock of the new company to be issued to the beneficial owners.    The amount received by them was $1,300,000 in stock and $2,600,000 in mortgage bonds.    The railroad company resisted liability upon the bonds upon the ground that the full value of the property conveyed to it did not exceed $1,300,000, the amount at which the capital stock was fixed, and that it therefore followed that the $2,600,000 in bonds was without any consideration, and represented only a fictitious indebtedness.    A provision in the constitution of Arkansas (article 12, § 8) provided that "no private corporation shall issue stock or bonds, except for money or property actually received, or labor done; and all fictitious increase of stock or indebtedness shall be void."    The court held that this provision "did not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued."    "It is not clear, from the words used," said the court, "that the framers of that instrument intended to restrict private corporations—at least when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper: provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden.    We cannot suppose that the scheme whereby the appellant acquired the property, rights, and privileges in question for a given amount of its stocks and bonds falls within the prohibition of the state constitution.    The beneficial owners of such interests had the right to fix the terms upon which they would surrender those interests to the corporation of which they were to be the sole stockholders.    And, that subsequent holders of stock might not be misled, each certificate of stock states upon its face that the holder takes this stock subject to $2,850,000 of mortgage bonds of the company, which are secured by two mortgages duly recorded.    All that was done was to reorganize the Little Rock & Memphis Railroad Company upon the same basis, substantially, as to capital stock and bonded indebtedness, as existed, in respect to these properties, rights, and privileges, before the adoption of the state constitution, and while they were held and controlled by the com-

panies which preceded the appellant in the ownership. There was, consequently, no fictitious increase by appellant of its stock or indebtedness. Under these circumstances, it cannot be fairly said that the bonds secured by the mortgage were issued without any consideration whatever actually received in property." The foundation of the title of the appellant railroad company to the property now owned and possessed by it was the contract of January 23, 1886, between Kneeland and the bondholders' committee. The entire issue of bonds and stock of the new consolidated corporation was, in its essence, but the purchase price paid by the new company for the railroad in its rehabilitated condition.

The principal distinction between the provision of the Arkansas constitution construed in Railroad Co. v. Dow and the Ohio statute involved here is that the latter prescribes a minimum price at which bonds may be lawfully sold. But we are not here dealing with a sale for money, but with an exchange of bonds and stocks for a completed railroad, including its franchises. In this aspect of the case, are the bonds illegal unless the actual money value of the railroad, as ascertained by evidence, shall prove to be equal to 75 per cent. of the par of the bonds, plus the market value of the stock, which was also used in the purchase? If so, the record discloses no such state of facts as would justify us in holding that the statute has been violated. Indeed, the evidence relied upon to support the claim that the statute has been violated has not been addressed to this aspect of the question. The circumstances would tend to show quite the contrary. The old narrow-gauge road was bonded for nearly $10,000,000, and its capital stock exceeded that of the new company. This fact, taken into consideration with the fact that of the price so paid not less than $6,000,000 was to be expended in betterments upon the old road, and about $4,000,000 in paying underlying liens upon that road over and above the mortgage debt, and in a provision for the payment of interest upon the bonds so used for several years, tends strongly to establish that the actual value of the reconstructed railroad was equal to 75 per cent. of the par of the bonds, plus the value of the entire common and preferred stock, the first being estimated at 15 cents on the dollar and the last at 30. The Ohio statute did not forbid the sale or exchange of stock at its market value. Neither does it any more forbid the exchange of its bonds for a railroad, or their use in exchange for construction work, than did the Arkansas constitution. The most that can be said is that, if used in exchange for a railroad, or in payment for property or construction work, the railroad, or the property, or labor and materials, shall be the equivalent of the money price for which the bonds might be lawfully sold. Tried by this test, the appellants have not supported their averment. But, waiving the aspect of the case presented by the assumption that all the bonds and all the stock, common and preferred, represent the price paid for the reconstructed and re-equipped railroad required by the contract of January 23, 1886, and treating the transaction as one between Kneeland and the consolidated company, by which the former, in consideration of the bonds and common stock and one million of the preferred stock, agreed to pay off all under-

lying liens, and convert the old narrow-gauge railroad into a first-class standard-gauge railroad, and provide for the interest upon the bonds during reconstruction, we reach the question as to what was the money value of the contract under which Kneeland acquired the bonds. The price for which the bonds were sold was the money value of the obligations entered into by Kneeland; not the money value of the contract as he performed it, but as he was obligated to perform. The circuit court entered into a calculation of the money worth of that which Kneeland did. Upon that basis the conclusion was reached that the company realized 76.6 of the par value of the bonds, after applying the stock paid him at its market value. With that result we agree. Allowing for certain supposed errors in the values attributed to benefits received, there were certain items omitted or underestimated which offset any deductions we might be disposed to make. The true question, however, is not the value of the benefits actually received, but the money value of what Kneeland agreed to do. The pleadings are full of averments that Kneeland did not carry out his contract, and that he is liable to the company in large sums for breaches of his engagement in many particulars. Some of the creditors of the company have even sought to invalidate the bonds upon the ground of fraud in the performance of his contract. All relief upon this ground was properly denied for the reason that a subsequent creditor of the corporation has no right to complain of a fraud upon his debtor which the debtor has waived or refuses to litigate. Graham v. Railroad Co., 102 U. S. 148.

During the performance of this contract by Kneeland, many disagreements arose between him and the company touching his performance of the contract. In June, 1891, a compromise and settlement of all differences was agreed upon, which was assented to by both the company and the committee of the bondholders of the old Narrow-Gauge Company. By that agreement Kneeland acknowledged his indebtedness to the company in a large sum, and his obligation to pay some $600,000 of underlying liens, which are still unpaid. The railroad company and the bondholders' committee agreed that the trustees, Ingersoll and White, should deliver to him the bonds and stock remaining in their hands, to be held to secure his notes executed on the consideration before stated. They also solemnly acknowledged that all the bonds and stock theretofore delivered to Kneeland by the trustees had been lawfully and properly delivered, and discharged the trustees from all responsibility therefor. It is clear from this action of the corporation and those representing the old bondholders that neither the stockholders who consented to this settlement nor subsequent creditors may, at this late day, open up any mere question of breach of contract, and thereby affect bonds which had been theretofore delivered.

This question of the value of the contract with Kneeland is an aspect of the case to which neither the pleadings nor the evidence was addressed, and upon which the court is without the assistance of counsel. For this reason we are unable to compare the value of the work and equipment done or furnished with that agreed to be done

or supplied. There are, however, certain items about which we are not left in doubt. Kneeland contracted to discharge all claims against the old Narrow-Gauge Company which should be entitled to a preference over the first mortgage bonds. These claims, including receiver's debts, etc., were, at the date of the contract, estimated at $1,500,000. He might have that full sum to pay, or he might, by litigation, reduce the amount. He reserved the right to contest such claims at his own expense, and did succeed in cutting them down to about $1,100,000. Here was a margin of $400,000. How are we to estimate the price at which the company contracted to sell these bonds, unless we make allowance for a hazard like this? But it turned out that Kneeland in fact paid but $650,247 on these preferential claims, leaving unpaid about $500,000. Judge Taft allowed only the amount actually paid in estimating what the company had received. This was an error to the extent of the difference between the sum paid and the amount Kneeland is under contract to pay. If he fails to carry out his contract, he is liable, and this is an asset of the company. If he is insolvent, it is a misfortune which should not operate to make a sale illegal, which, when made, was legal, as being under a contract which, if carried out, would have realized the statutory price. One other item will serve to illustrate the difference between the value of Kneeland's contract and the value of that which was actually done under it. He agreed to pay the interest upon the bonds during the period of construction. He did pay such interest for the company to the extent of $1,766,465, and this is credited to him as a benefit received by the company. The same contract provided that the net earnings of the railroad while under reconstruction should go to the company, and be applied to betterments. This was the contract under which the bonds were sold to Kneeland. It was made January 23, 1886. It was adopted or became binding upon the new corporation June 19, 1886. It was unchanged until September 14, 1887, when, by agreement, it was so modified as to permit Kneeland to apply the net earnings to payment of interest, he agreeing to supply any deficiency. Under this modification Kneeland stands charged with $1,020,314, being amount of net earnings received by him and applied to paying interest on bonds which he was originally obligated to pay out of his own means. The contract on this one fact was worth something over $1,000,000 more to the company than it actually benefited therefrom. Is this subsequent arrangement by which the railroad company turned over to Kneeland $1,000,000 of the net earnings of the company to have the effect of reducing the price for which the bonds were sold, and thus render their sale illegal? If it is to have any effect, it must be limited to such bonds as were delivered after September 14, 1887. In the circuit court's calculation of benefits received nothing was included for expenses of litigation conducted by Kneeland, nor for salary and compensation of the trustees who held the bonds and stock during pendency of reconstruction, nor for salary and expenses of the bondholders' committee, all of which Kneeland paid under the contract. These should have been included in the price received. They aggregated

more than $50,000, and constituted a part of the price he was to pay for the bonds. In no view which can be reasonably taken is there shown any violation of section 3290, Rev. St. Ohio.

5. The next contention is that a majority of the bonds are void under section 3313, Id., which provides as follows:

"All capital stock, bonds, notes or other securities of a company purchased of a company by a director thereof, either directly or indirectly, for less than the par value thereof, shall be null and void."

The contention is that J. M. Quigley, who was a director and president of the consolidated railroad company, was the secret partner of S. H. Kneeland in the contract of January 23, 1886, heretofore in substance stated, and therefore a joint purchaser with Kneeland of the mortgage bonds of the company at less than par. To support this averment, Kneeland produces a copy of an agreement between himself and J. M. Quigley, and testifies that this agreement was but the written embodiment of a parol agreement which had existed between himself and Quigley prior to the date of the agreement of January 23, 1886. This contract is dated July 8, 1886, and was at that date signed and deposited, as a secret arrangement, with Robert G. Ingersoll, the private attorney of Kneeland, and his representative as one of the trustees to whom the railroad bonds had been delivered in escrow for delivery to Kneeland as his contract was performed. That agreement was in these words:

"Memorandum of agreement between Sylvester H. Kneeland, of the first part, and James M. Quigley, of the second part. Whereas, the party of the first part, on the 23d of January, 1886, made certain contracts for the reconstruction, widening of the gauge, and equipping of the line of railroad from Toledo to East St. Louis, now known as the Toledo, St. Louis & Kansas City R. R. Co., said contracts having been made with the first mortgage bondholders' committee or the trustees, respectively, of the lines of road heretofore known as the Toledo & St. Louis Divisions of the Toledo, Cincinnati & St. Louis R. R. Co., contracts of like character and tenor having been since made with the Toledo, Charleston & St. Louis R. R. Co., the Bluffton, Kokomo & Southwestern R. R. Co., and the Toledo, Dupont & Western R. R. Co., being the companies forming by consolidation the Toledo, St. Louis & Kansas City R. R. Co., before mentioned; and whereas, the party of the first part, owing to the complicated and hazardous character of the contracts above referred to, having been unable to associate with himself therein such persons as he desired and anticipated, and now finds himself alone, and in danger of failing to accomplish all he has undertaken, and for these reasons, and to better carry out the great work in hand, finds it necessary to avail himself of the extended acquaintance and great knowledge and experience possessed with respect to the railroad property by the party of the second part: Now, therefore, in consideration of the premises, and other valuable and sufficient consideration, hereto him moving, the party of the first part hereby associates with himself the party of the second part as full partner equally in all the contracts above mentioned. Any profit to be made thereby to be equally divided; that is to say, each to be entitled to one-half of such profits. And the party of the first part declares he has no associates or partner in such contracts but the party of the second part. It is agreed between the parties hereto that their respective duties shall be as follows: The party of the first part to have charge of the reconstruction and financial arrangements therefor, and negotiations looking to alliances with other companies. The party of the second part to attend to the closing up of the trust created under a certain trust deed or agreement dated April 9, 1884, to conduct and have charge of the various litigations and references involving the purchase-money fund in court, conflicting title, and all lawsuits pertaining to the line of said Toledo, St. Louis & Kansas City R. R. Co., and to manage the

business, other than financial, of the railroad company. If, owing to illness, or any other cause, the party of the second part should be unable to perform his duties as above, there is to be deducted from his share of the profits, before a final division, the amount required to pay the persons other than legal counsel who may be employed to take his place and do his work. The party of the first part in his department to be without restriction, except that he shall not close any negotiations tending to reduce the interest or profits of the party of the second part without the consent of the party of the second part. Any profits in securities or money withdrawn before the completion of the contracts shall be divided equally at the time."

So far as it appears, this corrupt agreement was known only to the parties thereto, and to the depository thereof. The relation thus established continued until September 8, 1887, when it was dissolved by mutual consent, and the signed agreement destroyed. A partial settlement of the profits seems to have been at that time agreed upon, and on July 5, 1889, Quigley received from Kneeland 180 of the bonds of the railroad company in compromise of his claims against Kneeland under this most infamous contract. The evil and vicious character of this arrangement by which Quigley was to become interested with Kneeland in the profits to be realized under this contract is at once seen when we recall that Quigley was not only the chairman of the bondholders' committee, which was the other party to the contract, but the president of the consolidated railroad company, which by the act of consolidation had assumed or adopted the contract made in anticipation of its organization. The object in uniting Quigley with himself was plainly to facilitate the acceptance of the work he was doing in the reconstruction of the railroad through Quigley's influence with his fellow directors, and more directly through his influence with Isaac W. White, the representative of the old bondholders' committee and of the new railroad company. This influence Kneeland says was supreme with White; the latter being, as he says, a mere "office boy" under Quigley. Between June 19, 1886, and September 7, 1887, bonds aggregating $4,550,000 were delivered by Ingersoll and White, trustees, to Kneeland, under the terms of the contract of January 23, 1886; and the contention is that all of these bonds so delivered prior to September 8, 1887, when the relationship between Kneeland and Quigley was dissolved, were bonds sold by the railroad company "directly or indirectly" to Quigley, who was a director of the company, for less than par, and are therefore "null and void," under section 3313, Rev. St. Ohio.

The first question is whether Quigley was associated with Kneeland when the contract of January 23, 1887, became obligatory upon the consolidated company. The constituent companies composing that company accepted the title to the railroad from Kneeland subject to the conditions of his agreement of January 23, 1886, and either expressly or impliedly assumed the obligations of that agreement. The same may be said as to the consequences which resulted from the consolidation of the constituent companies. The burdens, obligations, and contracts of the constituent companies were imposed upon the consolidated company as a consequence of the act of consolidation, and without any formal adoption of such contracts by the officers and directors of the consolidated company. Section 3384, Rev. St. Ohio; Compton v. Railway Co., 45 Ohio St. 592, 16 N. E. 110, and

18 N. E. 380; Railway Co. v. Ham, 114 U. S. 595, 5 Sup. Ct. 1081. That which was done after consolidation was in mere execution of the agreement imposed by law upon the consolidated company as a consequence of consolidation.    The date, therefore, of the assumption of the contract of January 23, 1886, by the railroad company, was June 19, 1886.    At that date was Quigley a joint contractor with Kneeland, or otherwise directly interested in the agreement then assumed by the company of which he on the same day became a director and president?    For the purpose of carrying this contract of July 8, 1886, back of the date of the organization of the consolidated company, Kneeland has testified that prior to the contract of January 23, 1886, he had a verbal agreement with Quigley that, if he obtained an agreement for the reorganization and reconstruction of the old narrow-gauge railroad, he (Quigley) was to have one-half the profits of the venture, and that that agreement was not put in writing until the paper of July 8, 1886, was prepared and signed. Quigley denies this, and says he had no other agreement with Kneeland prior to July 8, 1886, than an agreement that he would represent him in the matter of defending claims against the old company involving liens prior to the mortgage, and that Kneeland was to compensate him for this attention.    He says he did devote himself to this duty, and after a time found some disagreement as to the value of his services, growing out of differences of opinion as to the profitableness of the Kneeland contract, and that Kneeland finally proposed to give him one-half of his net profits for his services in the matter of underlying liens.    We have given attentive consideration to the evidence of Robert G. Ingersoll, but fail to find anything in it which is inconsistent with this statement of Quigley.    The actual date when this corrupt agreement was originally made is of the utmost importance, and upon this point Mr. Ingersoll's memory is utterly valueless, and nothing detailed by him as to conversations with Quigley is in any way inconsistent with the statement of Quigley that this agreement under which he acquired an interest in the profits of Kneeland's contract with the railroad company was made July 8, 1886, being the date of the contract signed by him.    The contract itself contains internal evidence that Kneeland had had no associate, and had not contemplated theretofore an association with Quigley.    Between Kneeland and Quigley, we should prefer to accept the statement of the latter.    He at least has not voluntarily exhibited himself as a party to this disgraceful and corrupt bargain.    The circumstances also tend to confirm Quigley's account of the matter, and we concur with confidence in the conclusion reached by the trial court that this contract of July 8, 1886, bears the true date of the agreement, and that the effort to carry this corrupt arrangement back to the contract of January 23, 1886, has been unsuccessful.    Kneeland was not a director of the company, and it was perfectly legitimate for it to sell to him its bonds and stock at any satisfactory price, provided only that the provisions of section 3290 were not violated. Kneeland was the only party known to the railroad company at any time, and was the only party with whom it had any contractual relations.    Under a perfectly valid agreement, all of the bonds of the

company were delivered to Ingersoll and White as trustees, to be delivered as the contract with Kneeland should be performed. This was the contract and the status of these bonds when Quigley bargained with Kneeland for an interest in the profits of the contract. However vicious and corrupt this agreement was, in view of Quigley's duty as a director to protect his company against the improper claims of Kneeland, it was not a purchase of bonds by Quigley from the railroad company. Whatever title or interest he acquired in such bonds, he acquired through and under Kneeland. When the company assumed this agreement (whether it did so as matter of law or by formal adoption is of no moment here), and placed the bonds in the custody and control of the trustees, to be delivered as Kneeland's contract was performed, it parted with them, and could make no other disposition of them, unless its title should be recovered through failure of Kneeland to perform his agreement. Kneeland might have sold them to whomsoever he pleased, and at any price he saw fit. The prohibitions of the statute apply only to original sales made by the company. Kneeland might sell to a director as well as to a stranger. The indirect purchase by a director, prohibited by the statute, is a purchase for a director by another, or by a director in the name of another. It cannot be said that Quigley indirectly purchased bonds from the company by obtaining them from Kneeland, either by a purchase out and out, or by a contract for participation in his profits. Certain of the bonds delivered to Kneeland were subscribed for by Havemeyer, Herbeck, Quigley, Stout, and Brown, when directors. This was done under an agreement with Kneeland by which he agreed to let the old narrow-gauge bondholders have an equal amount of the new bonds and common stock for the par value of the bonds in cash. This subscription to these bonds was made after the first 2,000 bonds had been actually delivered to Kneeland. This was not a purchase from the company, but a purchase from Kneeland. But Kneeland says this privilege of subscription was really a part of his agreement of January 23, 1886. This is so only in a modified sense. It was wholly collateral to his contract, and seems to have been a personal verbal concession made by him to induce the old mortgage bondholders to consent to change the original plan for the reorganization of the old railroad, under which they were to receive second mortgage bonds of the proposed new company for their old bonds, and accept preferred stock instead. To induce them to accept this change, he agreed that he would, at their option, sell them an amount of his first mortgage bonds equal to their old bonds and the same amount of his common stock, for cash, at the par of the bonds. This was a purely personal and collateral arrangement between Kneeland and the beneficial owners of the old railroad, and was no part of the obligation assumed or adopted by the consolidated company. Those to whom the privilege was extended were not obligated to take bonds from him, and did not avail themselves of the option until after Kneeland had become the actual owner of the bonds. Upon the facts of the case, we agree with the conclusion of the circuit court that none of the bonds were sold in violation of section 3313, Rev. St. Ohio.

But we also affirm the decree upon this point upon another ground; that is, that none of the appellants were entitled to challenge the validity of the mortgage bonds. The railroad company made no such issue. Its answer was a formal traverse of the formal averments of the bill, and made no question as to the validity of the bonds under section 3313, Rev. St. Ohio, issued by it, and secured under the mortgage sought to be foreclosed. This defense has been made only under issues presented either by the answers or intervening petitions of general and unsecured subsequent creditors of the railroad company. May such creditors rely upon section 3313 as a defense against the enforcement of a mortgage and mortgage debt existing when they became creditors, and of which they had notice through registration? Are bonds sold by an Ohio railroad company at less than par to a director so absolutely null and void that any subsequent creditor may interpose the defense and destroy the obligation, even in the hands of an innocent holder for value? Are they so absolutely void that neither the company nor its stockholders can waive the objection or validate them by subsequent ratification or long acquiescence? The construction contended for by counsel for appellants is that the bonds are void to all intents, and in the hands of every holder, and that the defense to them may be made by any creditor of the company. The question has never been before the supreme court of Ohio, and is therefore one for original and independent opinion. The same question was made in the case of Zabriskie v. Railroad Co., 23 How. 381.– 399, but was not decided. The statute declares all bonds sold in violation of the statute to be "null and void." But nothing is better understood than that the word "void" is more frequently than otherwise used in the sense of "voidable," both in contracts and statutes. Thus, in leases, contracts of insurance, and contracts of sale, the word "void" is almost universally construed as meaning voidable at the option of one of the parties, and therefore capable of being waived and enforced over the objection of the other. The cases illustrating this are innumerable. The same interpretation is often given to the words "null and void," when found in statutes. The statute provides that all bonds sold by the corporation to a director at less than par shall be "null and void." If we are compelled to construe the word "void" in its literal sense, there is an end to the argument. That which is void is incapable of enforcement, and cannot be ratified or confirmed. In this sense, an act of a corporation wholly beyond the corporate powers is void and incapable of confirmation or enforcement. Iron Co. v. Riche, L. R. 7 H. L. 653; Thomas v. Railroad Co., 101 U. S. 83; Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24–59, 11 Sup. Ct. 478; Trust Co. v. Boynton, 37 U. S. App. 602, 19 C. C. A. 118, and 71 Fed. 797.

In Anderson v. Roberts, 18 Johns. 529, Spencer, C. J., in differentiating void and voidable acts, said:

"Whenever the act done takes effect as to some purposes, and is void as to persons who have an interest in impeaching it, that act is not a nullity, and therefore, in a legal sense, is not utterly void, but merely voidable. Another test of a void act or deed is that every stranger may take advantage of it, but not of a voidable one."

This distinction is one recognized by the Ohio court in Terrill v. Auchauer, 14 Ohio St. 80–88.

It appears to us that there is good reason for refusing to give to the words "null and void," in section 3313, any narrow or rigorous construction, and good reason for interpreting them as used in the sense of "voidable." The reasons for this construction are found in the object of the statute. The object was not to compel the sale of all such corporate securities at par. There is no statute in Ohio prohibiting a corporation from disposing of its capital stock at its fair market value, except to a director. Neither is there any policy to be discovered from the statute of that state regulating the organization of railroad corporations from which we might infer a purpose to compel sales of corporate stock at par only. Neither do we find any statute which forbids generally the sale of railroad bonds at less than par. Upon the contrary, section 3290 declares sales at any price not less than 75 per cent. of par value to be valid and regular, and does not in terms declare sales at less than that price as operating to destroy bonds so sold. Neither does this section 3313, nor any other Ohio statute, prohibit sales of either corporate stocks or bonds to directors. The plain and obvious object was to protect such corporations from improvident or fraudulent sales of such securities by directors to directors by requiring that such sales shall be for not less than par. The statute affects only the personal capacity of the directors to buy bonds from the corporation at less than par. No public policy is declared upon the face of the statute, and none is discoverable from the evident object and purpose of the law. By section 3290, the state consents that sales of bonds shall be valid and effectual if made at any price equal to, or in excess of, 75 per cent. of par. If we assume that that statute is based upon some principle of public policy looking to the interest of the public who may become creditors of the company, then the public policy of Ohio and the interests of future creditors are protected by requiring that all bonds shall be sold at not less than 75 cents on the dollar. Whether bonds are sold to a stranger, a stockholder, or a director at 75 cents, or at any sum above that and below par, does not affect any public policy which may be indicated by section 3290. It follows, therefore, that if directors are not permitted to buy bonds at 75 cents, as all the rest of the public may, the prohibition is intended to protect the corporation against sales by those who represent the corporators to themselves, and that the public have no concern, except so far as the public interest may be regarded as protected by section 3290. We are therefore led to construe the statute as one intended only for the benefit of railroad corporations and their stockholders. Such a statute serves its purpose when construed as making sales in violation thereof voidable at the instance of the corporation for whose benefit it was enacted, whether the latter be put in motion by its proper officers, or by stockholders when the corporate management refuses to act. The rule deducible from the decided cases is this: Where the enactment is not based upon some declared or evident ground of public policy, but has for its object the protection of persons sui juris, the word "void" will generally be construed as "voidable" only at the election of the persons for whose

benefit the enactment was passed.    In Ohio this rule of interpretation was applied in Terrill v. Auchauer, 14 Ohio St. 80, where a statute which declared that a purchase at a judicial sale by one who acted as an appraiser of the property should be "considered fraudulent and void" was construed as making such a purchase voidable only on interposition of a party in interest directly for the purpose of avoiding it.    The Ohio court, in the case cited above, after considering the object of the statute under consideration, said:

"It would seem that we ought to construe the word 'void,' in this statute, as meaning 'voidable' only, if we can find any established rule by which to distinguish cases in which it has been and ought to be so construed from those in which a literal construction has been adopted, and to hold that this case comes within the former category.    Such a rule, we think, is found in the following language of Bayley, J., in Rex v. Inhabitants of Hipswell, 8 Barn. & C. 471, where, discussing a question of statutory construction, he says: 'But it is said that "void" is sometimes construed "voidable," and, where the provision is introduced for the benefit of the parties only, such a construction may be right, but where it is introduced for public purposes, and to protect those who are incapable of protecting themselves, it should receive its full force and effect.'    Tested by this rule, the word 'void,' in the statute under consideration, may be held to mean 'voidable' only, for this provision of the statute was obviously introduced only for the benefit of parties to be affected by the sale. The public at large have no interest in the matter, and the parties in interest have full opportunity to protect themselves by interposing to prevent the confirmation of a sale, or moving to set it aside, or, in a proper case, by a direct proceeding to avoid it after the conveyance is made.    A rule substantially similar is stated by Lord Denman in Pearse v. Morrice, 2 Adol. & E. 94, in these words: 'The word "void" had certainly been construed as "voidable" in some instances, where the proviso was introduced in favor of the party who did not wish to avoid the instrument.' "

In Bank v. Portner, 46 Ohio St. 381–384, 21 N. E. 634, the court held that the indorsee of a check could not recover against the drawer, although he took same for value and without notice of any vice in the transaction, because of the provisions of section 4269, Rev. St. Ohio, declaring all notes, bills, bonds, and contracts, when given for money won or lost upon any game, to be "absolutely void and of no effect."    But the Ohio court clearly distinguished the principle upon which it proceeded in that case from the principle to be followed where the statute using the word "void" is not one enacted for the purpose of advancing some public policy, by saying:

"Notwithstanding the general tendency of courts to construe the word 'void' as 'voidable' only, when used in statutes that affect contracts made in disregard of their provisions, yet where a public policy is to be subserved, as the suppression of usury or gaming, the settled rule is to give to the language employed its full force and effect.    The rule with its limitations is thus stated by a very reliable author on the interpretation of statutes: 'In general, however, it would seem that, where the enactment has relation only to the benefit of particular persons, the word "void" would be understood as "voidable" only, at the election of the persons for whose protection the enactment was made, and who are capable of protecting themselves, but that when it relates to persons not capable of protecting themselves, or when it has some object of public policy in view which requires the strict construction, the word receives its natural full force and effect.'    Maxw. Interp. St. (2d Ed.) 256."

Thus, a Massachusetts act declared all mortgages given to secure usurious obligations "utterly void."    The supreme court of Massachusetts interpreted the purpose of the act to be the protection of

mortgage debtors against usurious demands, and held the words "utterly void" as meaning "voidable" at the instance of the debtor, and that strangers to the title should not be at liberty to raise the question. Green v. Kemp, 13 Mass. 515. In Michigan a statute provided that no mortgage or sale "of any part of the mine works, real estate or franchises of any corporation" mentioned in the first section of the act "shall have any force or effect, or pass any title thereto, or interest therein, unless expressly authorized by the vote of three-fifths in interest of the entire stock of said company actually present, or legally represented, at some meeting called and notified" as required by law. A mortgage was sought to be foreclosed, and was resisted by an assignee of the equity of redemption, which had been sold at execution sale, upon the ground that the mortgage had not been authorized as required by the statute, and was void by express provision of the statute. The opinion of the court was by Cooley, J., who, in a clear and well-considered opinion, held that the defense could only be made by the corporators. The statute in question was construed as intended only to protect stockholders in mining companies, and upon this ground held to render a conveyance made contrary to its provisions voidable only, at the election of those for whose benefit the statute was passed.

This provision of the Ohio statute does not limit the scope of the powers of the companies affected, but only prescribes regulations as to the manner of exercising the general powers of the corporation. If this regulation of the disposition of corporate securities be one intended only for the benefit of the corporation, it is a provision which the corporation and its stockholders might waive. Zabriskie v. Railroad Co., 23 How. 381–398; St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393–403, 12 Sup. Ct. 953; Louisville Trust Co. v. Louisville, N. A. & C. R. Co., 43 U. S. App. 550, 22 C. C. A. 378, and 75 Fed. 433, and decided by supreme court of the United States May 15, 1899 (not yet officially reported) 19 Sup. Ct. 817; Central Trust Co. v. Columbus, H. V. & T. Ry. Co., 87 Fed. 815–826.

A statute of Illinois prescribed that any lease by an Illinois railroad company without the written consent of the Illinois stockholders "shall be null and void." It was construed as a provision enacted for the benefit of the stockholders alone, and to be availed of by them only. St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393–403, 12 Sup. Ct. 953.

The conclusion we reach is that subsequent creditors cannot avail themselves of a defense which the corporation has not made, and which was available only to the corporation. If the corporation chooses to acquiesce, a creditor who became such afterwards will not be heard to impeach the transaction. This is well settled in respect to a fraud practiced upon a debtor. If the debtor waives the right to impeach the transaction, or elects to abide by it, a creditor subsequent to the fact will not be suffered to inquire into or question it. Graham v. Railroad Co., 102 U. S. 148; Porter v. Steel Co., 120 U. S. 673, 7 Sup. Ct. 1206. So, where a transaction is within the general scope of the powers of the company, but is in violation of some limitation

of law upon the exercise of the power, it cannot be challenged by those who subsequently become creditors.   Sioux City Terminal Railroad & Warehouse Co. v. Trust Co., 27 C. C. A. 73, 82 Fed. 124–133; Central Trust Co. v. Columbus, H. V. & T. Ry. Co., 87 Fed. 815–828; Bank v. Whitney, 103 U. S. 99–103.

The corporation having made no issue, and having chosen to acquiesce in the purchase of the bonds averred to have been sold to directors, the defense is not available to subsequent creditors.   The consequences to innocent holders of securities, such as Ohio railroad bonds, would be most appalling and unjust if the provision in question should be construed as making such bonds void to all intents, and upon the challenge of any subsequent creditor, for a secret vice growing out of their original disposition by the corporation.   So harsh and unjust a construction is not necessary, and would be unjustifiable, in view of the object of the enactment.   A construction which casts upon innocent holders of such bonds all the consequences of a violation of the statute, and suffers the corporation to retain the benefits of such a violation of law, and the original purchasers to escape responsibility, would bring about most deplorable results.   The issuance and sale of bonds and stocks were within the general scope of the powers of the corporation.   Their sale at less than par to a director was a mere violation of the provision regulating the exercise of that power.   This regulation, being for the benefit of the corporation, is only available to the corporation while the bonds are in the hands of those who took them in violation of the law, or with notice that they had been purchased in violation of law.   It is a defense not open to strangers, nor to those who became creditors after the execution of the contract.   Upon this ground, as well as upon the ground that the evidence fails to show a violation of law by a sale to directors at less than par by the corporation, we affirm the decree of the circuit court holding that all the bonds are legal and valid obligations of the corporation.

6. The circuit court did not err in holding that the preferred stockholders were entitled to a preference over the common stockholders in the distribution of the property of the corporation after the payment of debts.   The form of these certificates of preferred stock has been heretofore set out.   The contention of the common stockholders of the company is that the words contained in the foregoing certificate, "this stock constitutes a lien upon the property," were inserted without authority of the corporation, and by the president, or some one acting for him, in the printing of the certificates, and that they were not authorized by the contract with Kneeland of January 23, 1886, nor by the resolutions of the board of directors.   The evidence fails to establish the contention that this language was inserted fraudulently.   The form of the certificate was left by the directors to Kneeland, who represented this common stock, and to Quigley, and the bondholders' committee, who represented those who were to receive the greater part of the preferred shares.   There was much conference between Kneeland and the bondholders' committee, and more than one form was suggested and considered.   The evidence as to the verbiage thus suggested and finally adopted is altogether un-

95 F.—34

satisfactory. The certificates in the form they now appear were issued in November, 1886, and the stock was shortly thereafter listed upon the New York Stock Exchange, at the request of the directors of the railroad company, and with the consent and knowledge of Kneeland, and have gone into general circulation without objection or protest until the question was made in this litigation. These facts strongly tend to establish that the form of the certificate was as agreed upon by Kneeland and Quigley, and the others composing the committee to whom that matter was referred. Whether the agreement of January 23, 1886, or the subsequent resolutions of the consolidated company, expressly authorized that the preferred stock should be preferred in respect to both the property and net earnings of the corporation, or whether either the contract or resolutions authorized the form in which such certificates were issued, the fact remains that the certificates were issued in the form they now appear, with the knowledge and sanction of Kneeland, who, in October, 1886, received 2,310 shares of this preferred stock, and admits that he then noticed both the lien clause in question, as well as the clause prohibiting any mortgage without the consent of the preferred stockholders. The stock ledger shows Kneeland to have been the holder of the whole block of common stock from June 19, 1886, until November 24, 1886, when he turned it over to Ingersoll and White, the trustees under the construction contract, who again delivered it to him, from time to time, in blocks, in payments under the construction agreement, and none passed to outsiders until November 24, 1886, when a delivery was made to him by the trustees, a part thereof being transferred on the same day by him to others. Thus Kneeland, while the sole holder of every share of common stock, received preferred shares from the company in the form they now appear. These he retained, without taking any step to correct the form of contract therein set out by which such stock was given a preference in the distribution of the property of the corporation over the common stock, all of which was owned by him. Three years later he received 5,000 other shares of the same preferred stock, without objection or protest. At that time he still owned a large majority of the common shares; and, while his receipt of preferred shares at that time could not affect others who had become owners of common stock theretofore by assignment from him, it is a strong circumstance to indicate that he had theretofore ratified and consented to the preference given the preferred shares over the common shares at a time when he was the sole representative of the common stock. A delay of more than 10 years in questioning the authority of the preference clause is in itself sufficient to raise a presumption of ratification. If the common stockholders had the right originally to have this lien clause stricken out, so far as it applies to the property of the company, they have lost that right, under the circumstances of this case, by their acquiescence and inexcusable delay. It is true that this is not a question between creditors and the corporation, or stockholders and third parties. But it is a question between holders of common and holders of preferred stock. If the common stockholders had an equitable right to have the lien clause in question stricken out, and the

contract declared illegal, they should have been prompt in their application to the corporation, or, if it obtained circulation before knowledge, then they should have been prompt in their application to the courts for relief. Mor. Priv. Corp. § 462; Banigan v. Bard, 134 U. S. 291, 10 Sup. Ct. 565; Kent v. Mining Co., 78 N. Y. 159–187, et seq.; Taylor v. Railroad Co., 13 Fed. 152. This they should have done, so that evil should not fall upon innocent parties who might buy such shares in reliance upon this clause. This they did not do, and only complained when the distribution of the company's property was about to occur. The evidence of acquiescence and ratification afforded by such inexcusable delay is an answer to the objection now made to the preference claimed, aside from all other questions we have considered. The objection that such a preference in the property of the company as is secured by this clause is illegal and unauthorized by law has been again pressed upon us. The same question arose in the case of Hamlin v. Trust Co., 47 U. S. App. 422, 24 C. C. A. 271, and 78 Fed. 664. The question was there most ably argued, and was decided upon full consideration. In that case we had under consideration the very preferred shares now in question. We said then that, "Ordinarily, preferred stock is entitled to no preference over common stock in relation to capital. But when there is an express agreement giving such a preference, not prohibited by local law nor the charter, we see no reason why it is not a valid contract, as between the corporation and such preferred stockholders, and binding upon the common stockholders." Such an agreement is nothing more than a contract between stockholders as to how they shall divide the corporate property and profits, and, if not prohibited, is clearly within the general powers of such corporators. It is difficult to see how such an arrangement is of the slightest consequence to the public, or to creditors of the corporation. It does not withdraw the property from the demands of creditors, and provides only for the division among those who are the beneficial owners of the corporate property, after the payment of corporate obligations. We see no reason for doubting the correctness of the view we took in the Hamlin appeal of the legality of such an agreement for preference, nor of the proper construction and intent of the words employed to give the preference complained of. Mor. Priv. Corp. § 461; Gordon's Ex'rs v. Railroad Co., 78 Va. 501; In re Bangor & P. M. Slate & Slab Co., L. R. 20 Eq. 59; McGregor v. Insurance Co., 33 N. J. Eq. 181.

7. The original decree of foreclosure denied to the preferred stockholders the right to use their stock in the payment of any bid made by them for the railroad property when exposed for sale under the foreclosure decree therein ordered. The ground for this denial, as stated by Judge Taft in his opinion, was as follows:

"Such a clause in a decree is, in effect, a distribution of the assets of the company among the stockholders, and would necessarily work to the prejudice of those creditors whose claims are not to be paid under the decree for sale. Are there not or may there not be such creditors? In the foreclosure proceeding, only judgment creditors are parties. Such a provision in a foreclosure decree would utterly ignore the rights of creditors whose claims are not reduced to judgment. Nor does the creditors' bill necessarily include all creditors of the company. The advertisement for creditors of the company under

the creditors' bill only invited, and only could invite, those to come in who wished to participate in the distribution of the proceeds of the sale between creditors; but it did not advise them that the surplus, if any, after sale of the property and payment of claims of those who made themselves parties, was to be divided among the stockholders. Those creditors who have chosen not to come in have the right to rely on this court's paying over the surplus to the company, to whom they can look for payment. Their failure to come in under the creditors' bill, which is a proceeding quasi in rem, only excludes them from any claim against the property, but it does not bar their claims against the company on a winding up, and for a distribution of the surplus realized by the company on the sale of the property under the creditors' bill. For this reason the application of the preferred stockholders for leave to use preferred stock to complete their bid must be denied."

Subsequently, upon application, he permitted a modification of the decree, and allowed such preferred shares to be used to complete any bid by such stockholders, under the conditions following:

"Upon application made by and on behalf of the cross complainants Hannibal E. Hamlin and others for a modification of the decree for foreclosure, entered April 1, 1898, the court grants the application by adding, at the foot of said decree, the following: Upon the issue arising between the cross bill of said Hamlin and others, and the answer to said cross bill of the defendant the Toledo, St. Louis & Kansas City Railroad Company, and the answer of S. H. Kneeland, for himself and other common stockholders, the court finds that said cross complainants and others as holders of the preferred stock in said Toledo, St. Louis & Kansas City Railroad Company have, by virtue of the terms under which said stock was issued, a priority over said common stockholders, not only in the payment of dividends, but also in the distribution of the assets, remaining after the payment of all the debts of said company, secured or otherwise, when the same may come on to be distributed, and therefore that, if said preferred stockholders or any of them choose to do so, they may deposit, in partial fulfillment of any bid which they may make at the sale ordered herein, shares of the preferred stock of said railroad company; provided, however, that such stock shall not be received for this purpose until the holders thereof shall have paid into the registry of the court a sum upon their bid in cash sufficient to satisfy all the costs and expenses of this suit and sale, all the receiver's debts, all the mortgage debt, and all the debts, claims for which have been filed either in this foreclosure proceeding, or under the creditors' bill consolidated herewith, with interest thereon to the day of distribution, as said debts have been or shall be hereafter adjudicated either under the foreclosure bill or the creditors' bill herein; and provided, further, that said preferred stock thus deposited shall be received to pay only that part of the surplus of the bid after payment of debts of the railroad company which its owners would be entitled to receive on their shares of stock in the distribution of the surplus among the holders of the entire issue of said preferred stock, and the remainder of said surplus, to be paid in cash, shall be held for ratable distribution to the owners of the shares of the preferred stock not joining in the bid; and provided, further, that, as a condition of the privilege of using the preferred stock to complete their bid as above permitted, such preferred stockholders shall, if they become the purchasers of the said mortgaged railroad ordered sold, hold said road thus purchased subject to a lien equal in amount to the entire surplus remaining out of the purchase price bid after the payment of all the costs, expenses, receiver's debts, and debts of the company, mortgage or otherwise filed and adjudicated herein, to secure the payment of any debts of said Toledo, St. Louis & Kansas City Railroad Company which have not been presented under this bill or the creditors' bill herein, as the holders of said claims may present them and establish their validity; and the court reserves the right to retake the mortgaged property again into its possession, to enforce the payment of said debts as they are presented, until the said surplus shall have been exhausted."

Hamlin and others, representing the preferred stockholders, have appealed only from so much of said decree as subjects the property, if

bought by them, to a lien "to secure the payment of any debts of said Toledo, St. Louis & Kansas City Railroad Company which had not been presented under this bill or the creditors' bill herein, as the holders of said claims may present them and establish their validity; and the court reserves the right to retake the mortgaged property again into its possession, to enforce the payment of said debts as they are presented, until the said surplus shall have been exhausted." The objection is urged that this decree will operate to leave the interest acquired by the preferred stockholders through the use of their stock in payment of their bid perpetually subject to a lien for an indefinite amount in favor of creditors who refuse to come forward and prove their claims in the creditors' suit, and subject also to new claims arising under obligations incurred by the railroad company which will be exclusively under the control of those owning the common stock. On the other hand, it is said that the duty of the court is to pay over any surplus, after paying the debts established in the administrative suit, to the officers and directors of the railroad company, whose duty it will be to hold same subject to the claims of creditors, and of stockholders, upon a legal dissolution of the corporation. The circuit court did not entirely recognize the contention of either the corporation or the preferred stockholders; for it refused to permit the corporation to receive the surplus, and allowed its appropriation by the preferred stockholders, subject to a lien in behalf of creditors of the corporation, if any should establish their debts who had not come into the creditors' suit. That the corporation is not technically dissolved as a consequence of the sale of its property and franchises may be conceded. The mortgage included the franchises of the corporation, and the decree of foreclosure includes the entire railroad and the franchises of the corporation. If, after providing for every debt which may be established under the administrative suit, there shall be a surplus, what shall be done with it? The situation is peculiar. The preferred stockholders, under the terms of their subscription, are entitled to obtain a return of their capital before the common stockholders are repaid. There will be no known debt remaining unpaid. There may be debts, however, not proven under the suit instituted for the purpose of ascertaining and paying all debts, and the shell of the corporation may continue a moribund existence, with the right to sue and be sued as a corporation. Are the principles of equity so inflexible that, under such circumstances, the court will not feel authorized to distribute this surplus, lest thereby unknown creditors may be prejudiced, or the technical rights of the corporators be violated? If the court was authorized by statute to decree a dissolution of the corporation, it would undoubtedly direct a distribution among stockholders, after ascertaining that no debts remained unpaid. This power to adjudge a technical dissolution the court has not. What, then, may it do? Here is a fund for which creditors do not apply, and which, in default of creditors, will belong to stockholders. But the equity in favor of a distribution by the court is strengthened by the fact that the preferred stockholders are entitled to a preference in the distribution of capital over common stockholders, and object to having that surplus paid over to the corporation, which is exclusive-

ly in the hands of the common stockholders, the preferred stock-holders having no vote in the management of corporate affairs. The difficulty arising out of the fact that a technical dissolution of the corporation has not occurred, and will not result from the sale of the corporate property, is, in our judgment, met by the fact that that which will result will amount to a de facto dissolution. The object and purpose for which the corporation was created were to own and operate its railroad. When that railroad and all other corporate property and the corporate franchise to own and operate its railroad shall have been sold and conveyed to the purchasers at foreclosure sale, that will forever put an end to the capacity of the corporation to do the only business for which it was created, and operate as a de facto dissolution of the corporation. Briggs v. Penniman, 8 Cow. 387; Slee v. Bloom, 19 Johns. 456; Bradt v. Benedict, 17 N. Y. 93–96; Sprague-Brimmer Mfg. Co. v. Murphy Furnishing Goods Co., 26 Fed. 572. Under such circumstances, a court of equity is justified in administering the assets of the corporation as if a legal dissolution had occurred. Under the creditors' bill and the cross bill of the preferred stockholders, through which they have asserted their preference in the capital over the common shareholders, the court may, after ascertaining that no debts remain unpaid, distribute the assets remaining among the stockholders according to the contract between them as determined in the foreclosure suit. If the surplus should be turned over to the directors of the moribund corporation, they would but hold it as trustees, and would be accountable to the preferred stockholders for its due administration. If they unreasonably retained such surplus, under pretense that debts might appear, a court of equity would, on suit of the stockholders, ascertain the existence of debts, and compel distribution. This is practically what was done, under such circumstances, in the case of Cramer v. Bird, L. R. 6 Eq. 143–147. The bill was by a preferred stockholder in behalf of himself and others against the corporation and its directors, and its object was to compel the directors to account to the stockholders for a surplus of capital in their hands, and make distribution thereof. The corporation had sold and transferred the property which it had been organized to manage, and had ceased to do business. Lord Romilly, master of the rolls, said:

"The case may be stated thus, assuming for a moment that no act had been passed for the winding up of companies: An act is passed enabling certain persons to form a railway and a harbor, and they are constituted a corporation for making and maintaining that railway and harbor. By a second act their powers are extended. They are unable to carry on their works, and a third act is passed, reciting that their powers had become extinct, and authorizing the transfer of their undertaking to another company, which is accordingly effected, the property is sold, and, after providing for all the liabilities of their own company, the directors have a balance of several thousand pounds in hand. Can it be said that there is no remedy, and that they are entitled to keep this money for themselves? The proposition amounts to this: That, unless the act of parliament gives a remedy, there is none. I consider that they are trustees for the members of that body which was once a corporation, but which has become extinct, and that this court, making all due and just allowances to them, may call on the directors to pay the money, and divide it among the persons entitled, as though no winding-up act had ever passed. This case does not, in my opinion, come within the 199th section of the companies act of 1862, nor

within the railways abandonment act of 1850 (13 & 14 Vict. c. 83), nor the railway companies act of 1867 (30 & 31 Vict. c. 127). None of these acts were intended to supersede the principles of equity, but only to assist the court, by giving additional powers, to enable persons to enforce equities, without those peculiar difficulties arising from the number of shareholders, and from the rules of equity, which theretofore had made it impossible for persons in such cases ever to get to a decree. I am of the opinion that there cannot be a plainer equity than this: that, where the functions of a corporation have ceased, the managers of that corporation are bound to account for all moneys belonging "to the corporation, and, when such moneys are improperly retained, this court will make a decree, in order that they may be divided among the various members."

A note shows that a reference was made to ascertain what debts and liabilities of the company remained unsatisfied. The doctrine of this case was recognized in Re Suburban Hotel Co., 2 Ch. App. 737. That which the court might do upon a bill filed by stockholders against the directors of a corporation which has permanently ceased to do business, and has lost the power to carry out the purposes of its organization, it may do, under the pending creditors' bill, in connection with the pleadings and decrees affecting this corporation and its property in the foreclosure case. The court should, in the administrative case, exercise the jurisdiction arising out of the fact that a de facto dissolution has occurred, and on that basis ascertain, as in Cramer v. Bird, whether any debts and liabilities remained unpaid. For this purpose it will be proper for the circuit court to cause publication to be made, requiring all creditors to file their claims within a reasonable time, to be prescribed by the court, and to establish the same before the master. After providing for the payment of debts so ascertained, it will be the duty of the court, no debt remaining unpaid, to declare a final distribution of the capital among the shareholders who, for this purpose, should file their certificates with the master. The decree of foreclosure will be so modified as to reserve a lien upon the railroad in the hands of the preferred stockholders, as purchasers, only for the payment of such debts of the Toledo, St. Louis & Kansas City Railroad Company as have or may be so established under the pending creditors' suit, and allowing such purchasers to intervene and contest all claims therein pending.

8. The petition, or so-called answer and cross bill, of Dana A. Rose, was properly dismissed. He was not a party, and had filed a verbose and belligerent pleading without leave of the court. Rose is a holder of preferred stock. The Hamlins, representing a majority of that stock, were suffered to become parties defendant to the foreclosure bill as representatives of the class. The facts and reasons permitting that intervention appear in the opinion of this court in the case of Hamlin v. Trust Co., 47 U. S. App. 422, 24 C. C. A. 271, and 78 Fed. 664. When Hamlin's appeal had resulted in his reinstatement as a party, the circuit court directed the master to make publication, directing all holders of preferred stock certificates like those set up in Hamlin's answer and cross bill to appear and become parties complainant to the representative cross bill filed by Hamlin and others. Rose was not content to have himself made a cross complainant with the Hamlins, as permitted by the order recited. Desiring to present his claim in his own way, and upon his own view of the facts, he de-

clined the invitation extended, and filed a pleading which purported to be an answer to the foreclosure bill and cross bill. In this pleading he averred that the preference secured to holders of preferred stock in the property of the company was unauthorized and fraudulently inserted, but claimed the benefits of the lien, if held valid. He attacked the validity of the mortgage bonds, upon the grounds already considered in a, former part of this opinion, and ended by attacking the validity of the preferred stock issued to Quigley. There was no authority for Rose's admission as a party, save as a co-complainant with Hamlin. He did not choose to avail himself of that privilege. He consequently was never a party to the suit, except in so far as he may be bound by a decree through representation by those having the same interest and admitted as representing the class. This gave him no independent status as a party. The right to file his stock and prove it up before the master, if he had such right at that stage of the case, with the rights incident to such an appearance, is a right of which he did not avail himself. Rose says he could not adopt the pleading filed by the Hamlins. The averments of his own pleading show that he was not one having a common interest with the body of preferred stockholders. If he wished to contest the validity of the lien claimed by such stockholders, or the validity of some of the certificates, the Hamlin suit afforded him no field and extended to him no invitation. He should have sought admission as an independent defendant. This he did not do, unless the unauthorized filing of his pleading be regarded as an application for leave to intervene. If so, it was denied him. From a decree refusing leave to intervene and become a party, no appeal lies. Ex parte Cutting, 94 U. S. 14. We entertained Hamlin's appeal because, after being admitted as defendant, he was excluded upon the ground that his intervention was without merit. The decree would have concluded him in another suit. His remedy was by appeal. Not so with Rose. He was never admitted as a party. He had the right to come in as a co-complainant with Hamlin. That he did not do. His appeal must be dismissed. The decree of the circuit court involved by the appeal of the Toledo, St. Louis & Kansas City Railroad Company and those joined with it is affirmed. The appeal of Hamlin and others, from so much of the foreclosure decree as subjected the railroad, if purchased by the preferred shareholders, to a lien in behalf of creditors who should not establish their claims in the pending creditors' suit, is sustained, and the decree of foreclosure modified so as to limit such lien to such debts as shall be established in the administrative suit. The costs of the Hamlin appeal will be paid by the receiver.