### NOLTE et al. v. HUDSON NAV. CO.

(Circuit Court of Appeals, Second Circuit. April 5, 1926.)

No. 377.

**1. Trial ☞2.**

Consolidation of creditors' suit and two mortgage foreclosure suits against the same corporation, being merely procedural and affecting no substantial interest, *held* justified.

**2. Appeal and error ☞1073(1)—Although apportioning assets between mortgagees and general creditors without judicial determination was improper, appraisal will not be ordered, where result was practically same as that estimated by objecting creditor.**

Where decree directed receiver's sale of property of navigation company, part of which was mortgaged, and apportioned purchase price between mortgagees and general creditors, without judicial determination based on evidence, decree will not be reversed and appraisal of assets required, even though method used was improper, where result obtained was practically the same as estimate made by objecting creditor.

**3. Appeal and error ☞877(2).**

Corporation is not concerned with division of assets between mortgagees and general creditors in consolidated suits for receivership and foreclosure, and cannot, on appeal, object to method of apportionment.

**4. Appeal and error ☞1073(1)—Though term of sale providing buyer should guarantee dissatisfied creditors certain percentage was undesirable, decree will not be reversed, where buyer outbid reorganization managers.**

Where decree for sale of corporation's property in consolidated suits for receivership and foreclosure of mortgages provided buyer should guarantee any dissatisfied creditor 10 per cent. or other optional privilege, *held* that, although such was an undesirable term of sale, decree will not be reversed, where successful bidder had to outbid reorganization managers of corporation.

**5. Appeal and error ☞1073(1)—Including sale of cash on hand in decree for sale of corporation's property, while meaningless provision, was such as could have done no harm.**

Including sale of cash on hand in decree for sale of mortgaged and unmortgaged property of corporation in hands of receiver *held* a meaningless provision, and as such harmless, even though improper.

Appeal from the District Court of the United States for the Southern District of New York.

Creditors' suit by Charles H. Nolte, for whom Elizabeth M. Nolte, executrix, and Frederick W. Nolte, executor, under the last will and testament of Charles H. Nolte, deceased, were substituted, against the Hudson Navigation Company, wherein Middleton S. Borland and another were appointed receivers, and suits by the Farmers' Loan & Trust Company and by the National Commercial Bank & Trust Company against the Hudson Navigation Company; the three suits being consolidated. From the decree, defendant and the National Surety Company, an intervening creditor, appeal. Affirmed.

See, also, 8 F.(2d) 859.

Appeal by the defendant, Hudson Navigation Company, and the National Surety Company, a creditor of Hudson Navigation Company, from a decree of the District Court for the Southern District of New York, directing the foreclosure and sale of its property. Appeal by the Hudson Navi-

gation Company from a decree confirming said sale under the same decree.

The first of the three suits in which these appeals are taken was commenced on February 16, 1921, by the filing of the usual creditors' bill on behalf of a simple creditor of the Hudson Navigation Company. It alleged that the company was embarrassed and prayed a receiver to conserve its assets. On the defendant's consent receivers were appointed on the same day and at once qualified and took possession. On March 2, 1891, the New Jersey Steamboat Company, the predecessor in interest of the defendant, had issued a mortgage to the Farmers' Loan & Trust Company upon all its assets, consisting of certain steamers plying on the Hudson river, together with real property used for wharves, wharf rights, franchises, and other ancillary property. After the defendant had taken over the property of the New Jersey Steamboat Company, it executed its own mortgage to the Union Trust Company, the predecessor of the National Commercial Bank & Trust Company, on February 1, 1908, which covered all the property then owned by it. The trustee under the first mortgage, which was in default, filed an ancillary dependent bill to foreclose it on March 12, 1921, and had the receivership extended to that suit on June 17 of the same year. On November 1, 1921, the trustee under the second mortgage filed a similar bill, and had the receivership extended to it as well, including in that order all income received thereafter.

The receiver conducted the business for five years with success, and ended the season of 1925 with more than $1,500,000 in his hands, all of which, with the exception of about $121,000 was the result of his operations. In April, 1925, a reorganization agreement was proposed to the District Court, and the issues in the foreclosure suits were referred to a special master, who reported on October 20, 1925. Thereupon the three causes were consolidated, and a final decree was entered on December 1, 1925, by which the two mortgages were foreclosed and the sale of the whole property, including the cash on hand, directed both in foreclosure and under the general creditors' bill.

This decree apportioned the purchase price to be received upon the sale between the two mortgagees and the general creditors in the proportion of three, three, and one, awarding to each mortgagee three-sevenths and to the general creditors one-seventh of the whole. It fixed an upset price, and directed that each parcel should first be sold separately; that thereafter the whole property should be sold as a unit, using for an upset price for the whole property the two upset prices of the separate parcels, together with $250,000 as an added amount for the free assets. The property was sold under the consolidated decree on February 4, 1926. There was no competition when the two parcels were offered separately, but upon all three as a unit the bidding between five bidders was active, 87 bids in all being made. The reorganization managers bid up the property to $4,200,000, but eventually let it go to an outside bidder for $4,200,200. This bid resulted in awarding to the general creditors slightly over $600,000 as their share for free assets.

The defendant appealed from the decree of sale, and from the decree of confirmation of the sale, on the ground that it was improper to include in the sale the cash in the receiver's hands, that the price was inadequate, that opportunity should have been given to the stockholders to prepare a plan by which they might pay the indebtedness and take over the property, and that the terms of sale chilled the bidding. The National Surety Company, a general and by leave of court an intervening creditor, appealed from the decree of sale on the same grounds. Both appellants also assigned as error those provisions of the decree which divided the purchase price in the prescribed proportions. They maintained that the free assets were of much higher value than what would so result; that the division had been reached without any evidence and by an arbitrary allocation, no better than a guess.

Nash Rockwood, of New York City (Boardman Wright, of New York City, of counsel), for Hudson Nav. Co.

George Pfeil, of New York City (Arthur P. Heinze, of New York City, of counsel), for National Surety Co.

Geller, Rolston & Blanc, of New York City (Edward H. Blanc, of New York City, of counsel), for Farmers' Loan & Trust Co.

Graham, McMahon, Buell & Knox, of New York City (Edward W. McMahon, of New York City, of counsel), for National Commercial Bank & Trust Co.

Murray, Aldrich & Roberts, of New York City, for Equitable Trust Co. of New York.

Kenneth Mackenzie, of New York City, for Assets Purchasing Corporation.

Abberley & Bryde, of New York City, for Nolte's Executors.

Before ROGERS, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] The consolidation of the causes was merely procedural and affected no substantial interest. It was certainly justified. Toledo, etc., R. R. v. Continental Trust Co., 95 F. 497, 505, 506, 36 C. C. A. 155 (C. C. A. 6). The general creditors might, of course, have insisted upon a sale of the incumbered assets separately, had they chosen, but it would have been a foolish course, for obvious reasons. There can be no question that they had the power to consent to a single sale. This, of course, involves the necessity of apportioning the purchase price in some other way than by valuations established by auction sales. The National Surety Company does not, however, as we understand it, complain of that, but insists that the apportionment should have been made after a judicial determination, based upon evidence, for which no guesses, however honest, were a proper substitute. In principle we quite agree. A court may not dispose of the interests of suitors without evidence, or cut a Gordian knot, because it takes time and money to untie it. But we are not prepared to say that a majority of the general creditors may not themselves come to a composition with lienors upon the apportionment of the purchase price, which will bind a minority. It may be that in such a composition the lienors ought not to be allowed to vote as general creditors at all; that would appear essential, since they have self-contradictory interests. It must be that a single creditor may show anything which casts any doubt upon the good faith of his fellows. It may again be that claims may not vote which have been assigned to a reorganization committee having a possible interest in preferring the lienors. In any case, a court ought to look at such votes with a suspicious eye. But if it appears that a majority of the general creditors, actuated only by their own interest, prefer an honest settlement to a tedious and expensive litigation, we do not hold that a minority may gainsay them.

We leave the point open, because we think it unnecessary to decide whether, if the majority has such a power, it was properly exercised here. Had the appeal come up before the sale, we might indeed have felt bound to decide that question, but after the sale the situation has changed. What might be a doubtful or untenable principle abstractly, may effect a reasonable enough result in a given case. In the case at bar it seems to us that the $600,000, which constitutes the free assets, is so nearly the utmost that the general creditors could get on any showing, that no possible good can come of a long trial, appraising the assets under form of law.

We say this because the estimate of the National Surety Company, made after a full disclosure of the facts, was only $625,000. It cannot be supposed that this was not at full values, and it was surely represented adequately by the $600,000 obtained at an auction sale. Again, the estimate of the defendant put the free assets at only one-eleventh of the whole property. We do not ignore the claim against the United States for $250,000, which is in litigation. Plainly no appraisal of that would be of any value. It seems to us a wanton waste of the property of all concerned to direct a general appraisal—for that would be necessary—on the chance that the recovery in the suit against the United States would raise the free assets to a greater proportion of the purchase price than $600,000. This is especially true, in view of the bondholders' power to prove in equity for the full face of their bonds, regardless of their security.

[2, 3] While, therefore, we are not disposed to assent to the method taken, or even to say that the consent of the general creditors, when purged of all question, would have been conclusive, we think that the National Surety Company has made no case for imposing so onerous a burden in the pursuit of so remote and uncertain an advantage. As to the defendant, we cannot see how it is concerned in any way with the division of the creditors' spoil.

[4] There remains, as we view it, only the question of confirming the sale. Various objections are raised: First, the decree in substance provided that the buyer should guarantee any dissatisfied creditor 10 per cent., or at his option as much as he could show his share would be above one-seventh of the bid. This, it is said, chilled the bidding. We think that it might, and that it was an undesirable term of sale to introduce. In general, it is a safe rule that the bidder must know his liabilities, at least within easily ascertainable limits. This clause left open an altogether vague liability, on which he must gamble, and he would certainly make sure, out of the face of his bid, that the odds were not against him. Once more, except for the result, we might find it impossible to affirm the decree, and we wish expressly to withhold assent to this provision. But we can hardly see how it could have done any harm, as things turned out. The successful bidder was driven to his last bid by the reorganization managers. Their bid represented the value of the prop-

erty to them, and they knew more nearly than any outsider could know the extent of the possibilities left open by the objectionable provisions. The objection being only to the uncertainties so introduced, we think that the insiders' bid corrected any shortening of the bid which might otherwise have occurred.

Besides, the last bid of the managers represented the full value to them of the property, and was an appraisal of it by those entitled to make their opinion valid. In letting the property go for more, they, the enormous majority of those interested, in effect parted with it to an outsider. It would take a strong showing to persuade us that the sum agreeable to them was inadequate. As for the defendant, we are disposed to give it the shortest shrift possible. It had had five years or near it to prepare to redeem, and, having failed, it must go the way of others who borrow and cannot pay.

[5] Lastly, the sale of the cash, while, so far as we can see, it was a meaningless provision, could have done no harm. One hand washes the other, and the bidder need merely deduct it from his bid and leave it in the receiver's hands. Although it was improper to insert it in the decree, just because it was meaningless, the result purges that original fault. We assume that it was put in against the possibility that the managers should buy in the property. Had they done so, it might have caused trouble.

Decrees affirmed.